ROBERT JONTZ, Appellant, v. H. S. NORTHUP, Appellee.

**Drainage:** SURFACE WATER: NUISANCE: DAMAGES: EVIDENCE. A landowner may collect the surface water upon his land in a channel and discharge it into a natural swale or depression, and unless he substantially increases the volume, or discharges it in a negligent manner so as to injure his neighbor, he is not guilty of creating a nuisance, nor is he liable in damages; and he may thus drain the sloughs and wet places, but is not at liberty to discharge the water from large lakes or ponds on his land onto the land of others. The evidence in this case is held insufficient to show that defendant exceeded his lawful rights.

*Appeal    from    Jasper    District    Court.*—HON.   W.   G. CLEMENTS, Judge.

WEDNESDAY, OCTOBER 23, 1912.

ACTION to enjoin a nuisance caused by the casting of water by defendant upon plaintiff's land and to recover damages for the continuance of the nuisance. Defendant denied the alleged nuisance and pleaded that he did no more than discharge the water from his land upon the land of the plaintiff, which was the servient. estate, into a natural swale or water course. On these issues the case was tried to the court, resulting in a decree dismissing plaintiff's petition, and he appeals.—*Affirmed.*

*McClain & Campbell,* for appellant.

*Mowry & Cross,* for appellee.

DEEMER, J.—Plaintiff and defendant are owners of adjoining tracts of land; plaintiff's consisting of eighty acres composed of two forties running east and west, and defendant's of eighty acres running north and south. What is known as the North Skunk river, flowing in a southeasterly direction, crosses the southwest corner of plaintiff's land, and a swale or slough running in the direction of this river·commences north of the north end of defendant's land with branches coming in from both east and west. After these converge, a main slough extends entirely across defendant's land following the natural course of drainage down onto the land owned by plaintiff, and from there into North Skunk river. This slough or swale drains the surface water from about four hundred acres of land and varies in width with the contour of the ground. It had a fall of twenty-four feet across defendant's land. Save in dry seasons water constantly ran down this swale or slough, and during the spring floods was at times three and four feet in depth. Commencing at the Skunk river south of plaintiff's land there was an open ditch of natural origin running back northward upon plaintiff's land and to a point within two hundred feet of the line between the

two tracts of land. At its southern extremity this ditch is quite large and deep, requiring a bridge to cross it; but it decreases in depth as one nears its source. North of defendant's land were a number of open ditches, which, after converging, pass under a fourteen foot bridge in the highway, and enter defendant's land at the north line. This open ditch continued on southward through defendant's land to a point within eighty rods of the north line of plaintiff's land. There the ditch lost its identity and the water spread out over defendant's south forty.

It will be observed from this statement that the natural flowage of water was from north to south across the land of both parties, and that there were natural open ditches along the entire course save for about eighty rods on defendant's land, and for about two hundred feet on the land of plaintiff. At these points the water naturally spread out over the land and had no well-defined channel. Some time in April of the year 1908 defendant constructed a ditch upon his land from the end of the open ditch southward to within three or four rods of plaintiff's land, there changed its course at right angles, and ran it seven or eight rods westward parallel with the divsion line between the two tracts, and there stopped at what is called the "west pasture fence." He contends that he stopped the ditch at a point where the water ordinarily and naturally had always passed from his land upon that of plaintiff. This ditch was made with a plow, and consisted of a double furrow except at a boggy spot where a spade was used, and a ditch of about the same depth as the furrow was cut for a distance of about three rods. It is this ditch or furrow constructed by defendant which is complained of as constituting a nuisance. It might properly be here stated that plaintiff is the owner of another tract of land lying north and east of that owned by defendant, and that he (plaintiff) has for a long time run a tile from this land down to the open ditch on defendant's land near its south end. Plaintiff contends

that the open ditch complained of casts water upon his land which did not go there before, that prior thereto it was absorbed by the soil and evaporated from small ponds or low places where it was collected, and that the ditch made by defendant gathered this water and discharged it upon his land in increased quantities and made it unfit for cultivation. It is not claimed that the water is discharged form the ditch at a point where the surface water did not theretofore go, but it is contended that the channel was changed on defendant's land and water collected therefrom and discharged on plaintiff's land in increased quantities. It also appears that before the cutting of the ditch plaintiff had tiled out that part of his land adjoining that owned by the defendant by putting in four lines of tile, one at the west of the slough, another at the east, and another near the center, with a network of cross-tiles near the partition fence. This system of tiling practically reclaimed plaintiff's land, but after defendant dug his ditch the tile would no longer carry the water coming upon him from the north. After the ditch was dug plaintiff, as we understand it, opened up the string of tile running north and south at the north end thereof and put in a barrel, with the thought that the water coming from defendant's land would be taken care of by the tile; but he testified that this ditch caused sediment and debris to wash into the barrel filling it up so that the water could not get into the tile, and that the water and debris had already filled up what is called the west tile. He also claimed that the water from the ditch spread out over his land and made at least one-half acre of land entirely unfit for cultivation. He also claims to have spent several days in cleaning out the barrel which he placed at the end of his tile.

His testimony as to this tile and barrel was as follows: "I turned the water into the barrel to keep it from running over me. When it breaks out it spreads four or five feet. There has been an overflow there since I put in my

tile; high water all over. I don't remember that it filled up the barrel that time at all. I have the worst of it cleaned out now, and I took a spade and cleaned it out. There is a big hole punched in the barrel now, but I don't know how it got there. That hole is going to fill up that string. I did not see that hole made, but I could stop it up if it would be left alone." Another witness said of the tiling and the barrel: "Mr. Jontz showed us where his tile was, and I remember at the head of the tile was a trough to the barrel across the end of this ditch that run the water into one of those tile. There was one of the strings of tile that they told us wasn't working very well. They complained it hadn't been put in right. Mr. Jontz told me it wasn't working right. I saw this slough again in December, 1909. There was water running down the ditch. Mr. Jontz turned it into one of his tile ditches to straighten the trend and make the water run into his tile. The tile carried away all that was running then. It was a small ditch. It was wider than a plow furrow but for depth, I could not tell." And another said: "The ditch at the partition fence was not large. There was not very much water running down. That was in November, last fall. The general condition of the ground at that time was dry. There was just a small stream running. Mr. Jontz showed us where it went. He had it tiled. It run by his tile."

We are satisfied, however, from the entire testimony, that the defendant did not cause what is known as the west tile line to fill up, and that the tile into which plaintiff has turned the water generally takes care of that which comes through the ditch dug by the defendant; and we are further satisfied that the point of discharge of the water carried by that ditch is at the lowest place in the depression. Such being the facts, what is the law?

It would seem, if we are to follow what is said in the old case of Livingston v. McDonald, 21 Iowa, 160, and

what is said in *Stinson v. Fishel,* 93 Iowa, 656, that plaintiff has made out a case; but in recent cases there has been a departure from the doctrines there announced, and both the Legislature and the people in their sovereign capacity have undertaken to make it possible for wet lands to be reclaimed, even if by so doing the upper proprietor collects surface or percolating water and discharges it in increased quantities upon the land of his neighbor, provided, of course, that the natural course of drainage be followed. Section 1989-a53 of the Code Supplement reads as follows: "Owners of land may drain the same in the general course of natural drainage, by constructing open or covered drains, discharging the same into any natural water course, or into any natural depression, whereby the water will be carried into some natural water course, and when such drainage is wholly upon the owner's land he shall not be liable in damages therefor to any person or persons or corporation. Nothing in this act shall, in any manner, be construed, to affect the rights or liabilities of proprietors in respect to running water or streams." And the people in their sovereign capacity adopted the following amendment to the Constitution in the year 1908: "Add to section eighteen of article one of the Constitution the following: The General Assembly, however, may pass laws permitting the owners of lands to construct drains, ditches and levees for agricultural, sanitary or mining purposes across the lands of others, and provide for the organization of the drainage districts, vest the proper authorities with power to construct and maintain levees, drains and ditches and to keep in repair all drains, ditches and levees heretofore constructed under the laws of the state, by special assessments upon the property benefitted thereby. The General Assembly may provide by law for the condemnation of such real estate as shall be necessary for the construction and maintenance of such drains, ditches and levees, and pre-

scribe the method of making such condemnation." See also, 33d G. A. chapter 117.

Even before the adoption of the statute quoted we had recognized the right of an upper owner to drain his land onto that of his neighbor under proper circumstances. See *Dorr v. Simmerson,* 127 Iowa, 551. Since that time we have announced the following as the rule for such cases: "Without departing from the well-established rules with reference to surface drainage, this court as now constituted is inclined to construe them as liberally as is possible in order that reclamation of low and wet lands may be accomplished in the interest of good husbandry and for the general welfare of all." *Wirds v. Vierkandt,* 131 Iowa, 128. See, also, *Parizek v. Hinek,* 144 Iowa, 563.

In *Hull v. Harker,* 130 Iowa, 190, we said: "That the swale which we had referred to constitutes the 'natural water course' or the 'natural depression' referred to in the statute is plain from the evidence. To constitute a natural water course, it is not necessary that the flow of water through it shall have been 'sufficient to wear out' a channel or canal, having definitely defined, well-marked sides and banks. If the surface water in fact uniformly or habitually flows off over a given course having reasonable limits in width, the line of its flow is, within the meaning of the law, applicable to the discharge of surface water, a water course." See, also, *Lambert v. Alcorn,* 144 Ill. 313 (33 N. E. 53, 21 L. R. A. 611).

This entire matter received full consideration at the hands of this court in the recent case of *Obe v. Pattat,* 151 Iowa, 723, from which we make the following quotations:

Since the decision of *Livingston v. McDonald,* 21 Iowa, 160, numerous cases involving the law of surface waters have come before this court for consideration. In many instances that precedent has been approved and followed, and in others it has been distinguished or held inapplicable,

The tendency of the holdings is to recognize neither the rule of the common law nor the rule of the civil law as being in all cases controlling to the exclusion of the other. See *Livingston v. McDonald, supra; Vannest v. Fleming,* 79 Iowa, 641; *Matteson v. Tucker,* 131 Iowa, 511, and cases there cited. (1) But in the absence of any statute affecting the situation, the doctrine of the civil law has been more frequently applied in cases of drainage of agricultural lands. As construed by the court, that rule, so far as it applies to the case before us, is that, while the owner of the dominant estate may insist on the surface waters having free flow from his lands in accordance with natural conditions and may himself interfere with such flow so far as the same is affected by the ordinary operation of good husbandry, he can not lawfully collect it into a mass and discharge upon his neighbor's premises 'in greatly increased or unnatural quantities to the substantial injury of the latter.' The quoted phrase is from Judge Dillon's opinion in the *Livingston* case, and accepting it as the essence of the doctrine of that oft-quoted precedent, it is undoubtedly still the law except as limited or changed by subsequent legislative action. As thus stated, it will be observed that, to call the law into action for the defense of the servient estate, the collection and discharge of water thereon in other than the place of its normal flow with the land in a state of nature it must be in 'greatly increased or unnatural quantities,' and that the damages which will sustain a right of action for such alleged wrong must be 'substantial' in character. In other words, the general doctrine which recognizes a merely technical invasion of one's premises or the infliction of a merely nominal injury as sufficient grounds for invoking the remedies of the law have here no application. To lay it down as the law that no man may so ditch or drain his premises that surface water shall be discharged therefrom in any other manner or at any other place or in any other quantities than would characterize its flow, were the land left in a state of nature, would be to effectively block the progress of agricultural improvement over a very large part of the state. The purpose and essence of drainage is to interfere with natural conditions as to surface water, to gather it into tiles or open ditches, and convey it to some place of discharge. If it is to be of

any effect at all, the water cast from the mouth of the drain must be greater in quantity than would be discharged at that point under natural conditions. Even without a statute the rule of the adjudged cases is, as above stated, that the adjacent owner can not rightfully complain of the flow thereby cast upon him unless it be in such greatly increased or unnatural quantities as to be the cause of substantial injury to his premises. *Vannest v. Fleming,* 79 Iowa, 638; *Wharton v. Stevens,* 84 Iowa, 107; *Dorr v. Simmerson,* 127 Iowa, 551. Recognizing, doubtless, the necessity of encouraging reasonable methods of drainage and the advisability of a statutory rule which would put an end to such wasteful litigation, the Thirtieth General Assembly (Acts 30th Gen. Assem. chapter 70) enacted the provision which is embodied in Code Supp. 1907, section 1989-a53.

This case has been followed in: *Valentine v. Widman,* 156 Iowa, 172, and in cases from many other states which have the same drainage problems. See *Lambert v. Alcorn,* 144 Ill. 313 (33 N. E. 53; 21 L. R. A. 611); *Perry v. Clark,* 89 Neb. 812 (132 N. W. 388); *Aldritt v. Fleischauer,* 74 Neb. 66 (103 N. W. 1084, 70 L. R. A. 301); *Flesner v. Steinbruck,* 89 Neb. 129 (130 N. W. 1040, 34 L. R. A. (N. S.) 1055); *Manteufel v. Wetzel,* 133 Wis. 619 (114 N. W. 91, 19 L. R. A. (N. S.) 167); *Shaw v. Ward,* 131 Wis. 646 (111 N. W. 671, 11 Ann Cas. 1139); *Rieck v. Schamanski* (Minn.), 134 N. W. 228; *Boll v. Ostroot,* 25 S. D. 513 (127 N. W. 577).

Such a rule is wholesome and is especially applicable to conditions as they exist in this state, if we are to properly conserve our own interests and to reclaim our agricultural lands. We shall not take the time to discuss or analyze previous cases. They can not all be harmonized, and it is useless to demonstrate the point of departure. Suffice it to say, we do not think plaintiff has shown such an increase in the flow of water upon his land or such a change in the natural course of surface

water as authorizes a recovery. There was no increase save as the ditch collected water which theretofore spread out over the land and was evaporated or absorbed; but this is not sufficient to justify a recovery. Defendant did nothing with his land save to collect the water into a channel and discharge it into a natural swale or depression, and this he had the right to do unless he substantially increased the volume of water or negligently discharged it so as to injure his neighbor. The maxim, *"Sic utere tuo ut alienum non laedas,"* applies in such cases, but not to the extent of prohibiting the proper drainage of surface or percolating water into a natural water course or depression. This whole matter is quite fully covered in a note to *Manteufel v. Wetzel* reported in 19 L. R. A. (N. S.) 167 et seq. See, also, *Shaw v. Ward,* 131 Wis. 646 (111 N. W. 671), reported in 11 Ann. Cas. 1139, and note.

We are not to be understood as holding that one may thus drain out large lakes or ponds upon his own land to the land of another; but that he may so drain sloughs or wet places we have already decided. Such drainage must be done in a proper manner and so as not to substantially increase the flow. The facts in this case do not show such increase as to justify interference by the courts.

It follows that the decree must be, and it is, *Affirmed.*