WILLIAM M. LAMB, Appellant, v. J. C. STONE et al., Appellees.

**WATERS AND WATERCOURSES:** Surface Waters—Drainage—
1 Non-Increased Flowage on Servient Estate. Drainage, which brings to the servient estate no greater flowage than would occur without such drainage, affords no ground for complaint.

**WATERS AND WATERCOURSES:** Surface Waters—Drainage—In-
2 creased Flowage—Burden of Proof. The owner of the servient estate has the burden to show that the flowage upon his lands has been increased by the drainage improvements of the owner of the dominant estate.

*Appeal from Mills District Court.*—A. B. THORNELL, Judge.

MONDAY, JANUARY 15, 1917.

ACTION in equity for an injunction. Opinion states the facts. Judgment for the defendant in the court below. Plaintiff appeals.—*Affirmed.*

*N. S. Genung* and *Genung & Genung,* for appellant.

*John Y. Stone* and *C. E. Dean,* for appellees.

GAYNOR, C. J.—This is an action to enjoin defendants from maintaining a ditch upon their lands which, it is claimed, will have the effect of discharging water from a slough running through their lands, onto plaintiff's land.

1. WATERS AND WATERCOURSES: surface waters: drainage: non-increased flowage on servient estate.

The defendant Colgan is the owner of the NW ¼ of Section 17, and the W ½ of the SW ¼ of Section 17. The defendant Stone is the owner of the W½ of the SW ¼ of Section 8. The defendant Fisher was employed by the defendant Stone to dig the ditch in 1893, and has no interest in maintaining it, and no control over its continuance. John H. Witherbee is the owner of the W ½ of the E ½ of Section 17, and the E ½ of the SW ¼ of Section 17. The plaintiff owns the N ½ of Section 20, and the N ½ of the S ½ of Section 20. There is a slough crossing the land of the defendants and Witherbee, starting north of the north line of Section 17, and extending up into the Stone land in Section 8, then south in a southeasterly direction to near the east line of Section 17 in the NE ¼ of the SE ¼, turning thence south and a little to the west, reaching plaintiff's land at its north section line, about 40 rods east of the east section line.

The ditch complained of starts at a point in the slough slightly north of the south line of the NE ¼ of Section 17, then runs south, directly to a point near the south line of the NW ¼ of the SE ¼ of Section 17, and empties near the center of the SE ¼ of Section 17. The length of this ditch, therefore, is about 80 rods, and the extreme point is nearly 80 rods from the north line of plaintiff's land. The point of discharge from the ditch is on the Witherbee land. The ditch was made with the consent of Witherbee. The ditch extends a little into the slough at the point where it starts. It is a very shallow ditch, one plow furrow in the slough at

the north end of the ditch.  The ditch cuts through the bank
at the point where it leaves the slough, and, as it extends
to the south, runs out to the surface of the ground at the
south end, about 80 rods north of the public highway be-
tween Sections 17 and 20.  The elevation given at the public
highway is marked 7, and the elevation at the mouth of the
ditch, 80 rods north, is marked 7.  The ground is a little
irregular between the mouth of the ditch and plaintiff's land,
but only slightly so.  It is practically level.

Plaintiff's engineer testified:

"It is a fact that the land at the mouth of the ditch
both east and west and south of the mouth is so nearly level
that it requires an instrument and picture of places to find
any difference in the elevation."

The general surface of the ground there is almost level.
The general slope of all the ground is slightly to the south.
The elevation through which the ditch was cut was formed
by a deposit of silt.  There is testimony to the effect that
the slough nearly always contained water,—in dry weather,
sometimes not; and never overflowed except in times of high
rain, but then never drained out entirely.  Plaintiff testifies:

"There is very little variation in the level of this ground
south of this lake.  The general tendency of the whole slope
is to the south, with a fall not to exceed one foot to the mile."

Another witness testified that, when the water from the
slough spread out over the land south of the slough, the land
was so level and flat that "it just stays there."

The ditch complained of was about 3 feet deep in its
deepest place, and gradually grew shallower as it proceeded
southward, until, at the point where it emptied, it was level
with the ground.  The water at the south end of the ditch
was turned loose upon the meadow, and, we should judge
from the elevation appearing on the plat, would flow from
the mouth of the discharge east, west, and south, over the
south 40's.  From a point at least 60 rods north of the point
of discharge, the elevations shown upon the plat indicate the

land to be perfectly level until the point of discharge is reached. At that point, there seems to be a slight elevation. This is accounted for by the deposit of silt, which it is claimed was deposited by overflows, and it is through this that the ditch was cut.

If we are to credit the plat furnished us by plaintiff's engineer, we find that, at a point about 60 rods north of the discharge, the elevations are given 81, 81, 81, south to the point of discharge, marked 81.5. The next level we have is about 40 rods below that, marked 81.5, and this elevation continues on down to plaintiff's land, where, it would seem, the elevation is slightly higher, being marked 81.6. On the north line of plaintiff's land, north of the highway between Sections 17 and 20, directly south of this ditch, the elevations are given 81.5, 81.9, 81.8, 82.6 and 82.4. We give these elevations because of the conclusion we must reach from this record. The plat does not furnish us elevations east and west of the line of this ditch, but the evidence shows that there is a slight incline to both the east and west, from a line drawn south from the mouth of the ditch, and these were all on Witherbee's land.

Plaintiff's engineer testified:

"The area of the lake bed is somewhere from 30 to 40 acres of land. This lake bed had been covered with water so that it would not produce any vegetation. The extreme depth from the lake bed to the vegetation line would be in the neighborhood of a foot and a half. The south end of the lake is higher than the north end."

Lamb testified:

"There is very little variation in the level of this ground south of this lake. The general tendency of the whole slope is to the south, with an overfall of about a foot to the mile. This slough has no outlet. It was the receptacle simply of surface water."

Plaintiff further testified:

"The land near the mouth of the ditch is as near level as you can imagine land to be."

The testimony of Fisher, who dug the ditch, is to the effect that in the deepest place it was about three feet. After leaving the lake bed, it gradually became shallower, until it ran out on the surface of the ground. The deepest place in the ditch was about 400 to 600 feet south from the lake.

There was evidence to the effect that, when water overflowed the banks of this slough in times of excessive rain, the overflow went out at the south end of the lake and spread over the ground there; went out over its banks; that it went south and west. This would be onto plaintiff's land.

We take it that the ditch was open at the lowest point in the slough, the purpose being to keep the slough dry. It appears that this was the effect of the ditch in low water. No purpose would be accomplished by these defendants in the making of the ditch, unless it did drain the slough. The purpose of the ditch, if it accomplished any purpose, was to keep the slough dry in times of low water by a very slow process. The water from the slough in times of high water, it could not take care of. Its capacity was not great enough for that.

The evidence discloses that this slough gathered the water from a large area of land; that it held the water within its banks, except in times of great rains; that the overflow was occasioned by excessive rains; that, when it did overflow its banks, the overflow passed to the south, but only in times of very high water. Of course, in a way, in ordinary rains, the ditch would drain all the water from the slough in time. In times of great rains, it would carry some of the water from the slough, but very slowly. In times of excessively high water, it would have the effect of discharging only so much as it had capacity to carry. The slough was a mile and a quarter long, and to the lines of vegetation on either side, it was about 120 feet, varying at certain points. The slough varied in depth. It had an average depth of 1½

to 2 feet. This would afford a receptacle for a very large body of water. This water would and did overflow and escape from the confines of the slough and pass to the south, before this ditch was constructed.

Its general slope was towards the south and towards plaintiff's land. Considering, however, the depth and dimensions of this ditch, it is apparent that, in cases of high rain, it would not afford, even approximately, a channel for the escape of the high water that might accumulate in this large area covered by the slough, and this is emphasized by the fact that the fall could not exceed 1 foot to the mile.

Two things become apparent from a consideration of this record: First, in the absence of heavy rains filling this ditch to its full volume, or even when filled to its full volume, the ditch would carry the waterfall from the slough by such a slow and narrow process that its discharge at a point half a mile north of plaintiff's land would not violate any of the inhibitions upon the rights of the dominant estate in the handling of surface water. Second, in cases of excessively high water, such as would cause it to flow over its banks, this ditch would have almost an imperceptible effect upon the control and discharge of the water.

The law of this case has been settled by the repeated adjudications of this court, the latest found in *Pascal v. Donahue*, 170 Iowa 315; *Miller v. Hester*, 167 Iowa 180; *Jontz v. Northup*, 157 Iowa 6.

We have no disposition to depart from the rules laid down in those cases. This case involves a question of fact. The rule that surface water is a common enemy, and that each owner of land has a right to protect and guard himself against it and its injurious effects upon his own land, has never been questioned. Everyone must exercise his right, however, with due regard to the rights of his neighbor; but we are not able to find in this case, from the record, that this small ditch, constructed as it was, at the

2. WATERS AND WATERCOURSES: surface waters: drainage: increased flowage: burden of proof.

place where it was, would have the effect of discharging the surface water that accumulated in the slough, upon the lands of the plaintiff in any greater quantity than it would be discharged had the ditch not been constructed. The water is cast out from this slough on a large, level body of ground, with but a very slight inclination towards plaintiff's land. This slough, kept dry through the instrumentality of this ditch, will have the effect of draining the lake, at all times and at all seasons, by its continued slow, sapping process. At no time would a great body of water accumulate at the point of discharge. The water that naturally flows south from the surface of the ground, either from overflows or excessive rains, is one of the burdens the servient estate must bear; must bear because it is the servient estate. The burden of proof is on the plaintiff to bring the facts of his case within the law he invokes.

The claim of the plaintiff is that, by the construction of this small ditch, the defendants will discharge surface water upon his land from their land, in a manner or at places or in quantities other than would characterize its discharge if left to the course of nature. This, we think the record does not show. The record discloses that the judge before whom this case was tried visited this place, examined this slough, this ditch, and the ground in the vicinity of the mouth of the ditch, and found affirmatively that plaintiff had no ground for complaint, and dismissed his petition.

We are not satisfied that the plaintiff has carried his burden to a successful issue. We have read this entire record with care, and reach the conclusion that there is no ground for interfering with the judgment of the court below, and the case is—*Affirmed.*

LADD, EVANS and SALINGER, JJ., concur.