GODFREY DURST, Appellee, v. WILLARD A. PUFFETT, Appellant.

**WATERS AND WATERCOURSES:** Diversion—Injunction—Evidence. Equity will enjoin the continued diversion, to the injury of another, of the waters of a natural watercourse. Evidence reviewed, and held insufficient to establish such diversion by any act of defendant.

*Appeal from Woodbury District Court.*—J. W. ANDERSON, Judge.

TUESDAY, JUNE 19, 1917.

REHEARING DENIED SATURDAY, SEPTEMBER 29, 1917.

ACTION to enjoin the obstruction of a natural watercourse, and the diverting of the natural flow of the water in its natural channel, to the prejudice of the plaintiff. Decree for the plaintiff in the court below. Defendant appeals.—*Reversed.*

*F. L. Ferris,* for appellant.

*C. N. Jepson* and *J. F. Stecker,* for appellee.

GAYNOR, C. J.—This action is to enjoin
WATERS AND WATERCOURSES: diversion: injunction: evidence. the defendant from maintaining an obstruction in what is claimed to be a creek or natural watercourse, whereby the natural flow of the water in the creek is interrupted and the waters diverted from their natural course, to the prejudice of the plaintiff. ·

The plaintiff's and the defendant's land joins. Plaintiff's land is on the west. They are divided by a fence running north and south, about one-half mile in length. The plaintiff's land is in Section 18 and in the west half of Section 17. The dividing fence runs through the center of 17.

Defendant's land is to the east of this fence, and therefore in 17. The creek in question, we may assume for the purposes of this case, is a natural watercourse. It starts north and east of plaintiff's land, but through plaintiff's land runs practically due west to the fence; thence over defendant's land across a highway to a ditch on defendant's land, by which the water from the creek is carried still farther west and emptied into what is known as Oregon Creek; thence carried by Oregon Creek in a northwesterly direction to the Little Sioux River.

The plaintiff claims that the appellant obstructed the flow of the water through this creek at the division line, by placing rocks in the bottom of the creek at that point, the effect of which, plaintiff says, is to obstruct the free flow of the water and cause it to spread out and over plaintiff's land to his damage. The defendant claims, however, that he has not obstructed the natural flow of the water in this creek, and says that whatever damage the plaintiff has sustained has been caused by the natural overflow of water from streams and other causes.

This is practically a fact case. Much learning has been expended in effort to make it appear that, under the law of this state, if surface water from the dominant estate uniformly and habitually flows over a given course, having reasonable limits in width, onto the servient estate, the owner of the dominant estate has no right to cause this surface water to be discharged upon the servient estate in any other way, or in greater quantities, than it would so flow in the course of nature. Further, that a natural watercourse is not necessarily a channel with banks, but it may be such in contemplation of law, even though there are no banks, if the water uniformly flows in a certain line within reasonable limits; that a watercourse is the natural line of flowage. We are further told that it is not necessary that this watercourse be the result of natural causes; that it

may be aided by the hand of man, and if, so aided, it thereafter becomes a living, flowing stream of water for the requisite length of time, it becomes a watercourse, and equity will interfere to restrain diversion of the water.

These contentions have their support in *Pascal v. Donahue,* 170 Iowa 315; *Jontz v. Northup,* 157 Iowa 6; *Bramley v. Jordan,* 153 Iowa 295; and *Falcon v. Boyer,* 157 Iowa 745. So we have abundant authority for saying that the stream or creek or watercourse in controversy is a watercourse, and we will so treat it in the discussion of this case.

We have authority for further saying, on the assumption that this is a natural watercourse, that equity will enjoin the continued diversion of the waters from this creek from its natural course on plaintiff's land.

This brings us to a consideration of the facts as disclosed in this record. While the record discloses that plaintiff owns about 520 acres of land in Sections 17 and 18, west of the line running north and south through the center of Section 17, and defendant's land is all east of this line in 17, we have only to deal with so much of the land of either of these parties as lies in Section 17.

The plaintiff owns the east half of the northwest quarter, and the southwest quarter of the northwest quarter, and the northwest quarter of the southwest quarter, of Section 17. The defendant owns all of the northeast quarter of 17. The obstruction complained of is where the creek crosses the fence line between the land of the plaintiff and the land of the defendant, just north of the center of Section 17. There is a road running in a northeasterly and southwesterly direction across the southeast quarter of the northwest quarter of 17, cutting off about 2 acres in the southeast corner of this 40. The general character of the land that lies to the east and south of this highway is partly farm land, but mostly pasture. The southeast quarter

of the northwest quarter of Section 17 is rough. This is the 40 through which the highway runs, and there is quite a fall from the east side of this 40 to the west side towards the lateral ditch that serves as an extension westward of the creek. There is a bridge on this highway over this creek or lateral. This lateral was constructed about the year 1913, and was constructed to receive the waters from the creek coming from the defendant's land. The lateral continues west until it empties into what is known as Camp, or Oregon, Lake. This lateral is a part of a drainage system regularly established. The creek referred to starts at the top of the hill, about a mile and a quarter back of plaintiff's land. There are other little creeks or draws that empty into this creek.

At the point where the creek enters the Durst land, it is about 10 feet deep. Going eastward along this creek from the fence line that divides the land, the ditch has high banks, perhaps 4 or 5 feet. As this creek approaches the place where it is claimed this dam is constructed, it becomes shallow. At this point, defendant was accustomed to cross the creek, having land on both sides of the creek, and, as the bottom of the creek was soft, rendering it difficult to pass through with a team, he placed rocks on the bottom to make a solid base on which to cross from one side of the creek to the other. This is what the plaintiff denominates a dam, which, he claims, obstructs the flow of the water. The banks at this point seem to have been lower than at any other point on the creek line, and for this reason it was selected by the defendant as a place to cross from one side of the creek to the other to cultivate his land. The creek just west of the fence on plaintiff's land, west of where it is claimed this obstruction is, has well-defined banks, and receives a large amount of water from the hills.

The filling in the creek that causes overflows on plaintiff's land, so far as we can gather from this record, which

is not entirely clear, is west of this stone crossing, and on plaintiff's land. It seems to be assumed by the plaintiff that all the debris and all the filling that are found and described by the witnesses, west of this stone crossing, are due to the stone crossing; but there is nothing in the record that sustains any such assumption. It is also claimed that willows have grown up in this creek west of this stone crossing on plaintiff's land, and that the growth of these willows is due to this stone crossing. The evidence shows that the water coming down the creek from the east passes over this rock bottom quite as readily as it would without rocks. One witness for the plaintiff testifies that the water passes over these rocks pretty fast. This same witness says that trees and things have grown up and the channel is in pretty bad shape west of this stone crossing on plaintiff's land clear down to the bridge on the highway. It appears that, immediately west of this so-called dam, there is a drop of about 6 feet to the bottom of the creek; that the water going over the stone crossing has washed out the creek below to the west. It appears that vegetation and debris of various kinds were found by some of the witnesses west of this stone crossing on plaintiff's land. It is assumed that all this was the result of this stone crossing, while the evidence, considered from any fair standpoint, shows that the crossing had nothing to do with it; that it was the result of overflows and washings from the surrounding country, and not from any water diverted from its natural flowage in this creek.

The whole controversy on plaintiff's part seems to rest on the assumption that this stone crossing is the cause of what appears to us to be due to conditions existing on his own land, to which it is not shown that the stone crossing has contributed in the least. There is no evidence that this stone crossing has diverted any water from the natural channel, or that any of the conditions found west of the

stone crossing can be attributed to its existence. Surely
not the willows that are growing in the creek or along the
banks of the creek; surely not the logs and driftwood; for
if it reached the creek, it would have been carried just the
same without the stone crossing as with it, if carried by the
creek. In fact, there is no evidence that any of the condi-
tions found west of this stone crossing on plaintiff's land
are produced or brought about or even contributed to by
the existence of this stone crossing. Nor does it appear
that plaintiff has suffered or is likely to suffer any damage
by the continued existence of this stone crossing. No wit-
ness pretends to say that any water has ever been thrown
out of the channel of this creek by the reason of this stone
crossing, onto plaintiff's land.

We find no substantial basis in the record for the
granting of the writ in this case, and the case is therefore
—*Reversed.*

LADD, EVANS, and SALINGER, JJ., concur.