C. E. HUNT, Appellee, v. ROBERT SMITH, Appellant.

No. 47002.

June 17, 1947.

Johnson & Johnson, of Knoxville, for appellant.

Teter & Clements, of Knoxville, for appellee.

BLISS, J.—The parties are the owners of adjoining riparian farm lands along the Des Moines River, in Swan Township, Marion County, Iowa. Plaintiff's land is in Sections 23, 24, 25, and 26, and the land of the defendant is in Sections 24 and 25, and lies directly east of the plaintiff's. Plaintiff's land is the upper land, and with respect to drainage is the dominant estate, and the land of defendant is the servient estate. To clarify the statement of facts and to aid in understanding the matters involved we set out a drawing reproduced from the testimony and plats received in evidence. It is incomplete and inexact in detail, but, in general, is correct.

The parallel curved lines in the upper part—the north— represent the Des Moines River. Defendant's land is in the governmental divisions whose boundaries are indicated by the broken lines. Plaintiff's land lies immediately adjacent to the west, and is mostly northeast of the highway, which is marked by the parallel straight lines extending diagonally from the northwest to the southeast. The three creeks are marked A, B, and C. A, in the north part of Section 23, is Sugar Creek. B, which flows under the upper bridge in the highway, on the common boundary line of Sections 23 and 26, outlets in the small circle just southeast of the center of Section 23, a sort of a bayou formerly called Brand Lake, but now is generally a dry depression, and grown up with timber. This stream drains a watershed of 380 acres. The stream C crosses the highway under the lower bridge in the northeast corner of

Top of plat

NORTH

A

23 + O

Slough

B

26 +

C

24

25

Bottom of plat

Section 26 and flows eastward across the north part of Section 25 and then through Hodgson's Slough into the Des Moines River. This creek drains 860 acres. All of the land of each party between the highway and the Des Moines River is first bottom land. Most of this land, and particularly that of the plaintiff, is subject to overflow, annually or oftener, from the Des Moines River, which we will refer to simply as the "river" to distinguish it from creek C, which we will speak of as the "creek." Defendant has some higher ground south of the center of Section 24 on which the crops are seldom damaged by the overflow from the river. In 1946 much of the crop on plaintiff's

land was damaged. Some of the corn was planted three times that year. The flooding from the river was worse in 1945. And in 1944 it was much worse. Plaintiff bought his land, containing about 308 acres, in 1933 and moved on in 1934. During that time the creek has flooded considerable of the land two or three times and it has been overflowed several times by the river. A number of times the entire farm, except about 15 acres lying north of the house in the NW¼ of the NE¼ of Section 26, has been overflowed by the river. The creeks B and C drain high ground to the south and west, and open into the bottom land through ravines. Between the creeks B and C and the highway, and close to the latter, are high bluffs. After a heavy rain the water comes into the bottom through these creeks quickly and in considerable volume. The bottom land, particularly involved, extends diagonally from Sugar Creek in Section 23 through the common corner of the four sections to the east line of Section 25. Across plaintiff's land the bottom is almost a half mile wide, with the elevation somewhat higher along the bank of the river and the bank of creek C. The slough, extending through the middle of this bottom, has a swale or two through its center, of a width of 200 to 300 feet. Because of erosion, washouts, and fill-ins, the lines of the river and the creeks and the contour of the bottom have changed considerably over the years. The survey of 1848 shows that the Des Moines River did not touch Sections 23 and 24, but the toe of the horseshoe bend has been gradually creeping south and east. Rabbit Gully, which now opens into the Des Moines River at the extreme northwest corner of defendant's land in Section 24, was formerly on plaintiff's land, but with the erosion, and caving of the lower bank of the river, it now outlets into the river on defendant's land. Plaintiff said that he had lost 40 acres since he bought the land in 1933. But since he also owns land in the loop across the river he has probably gained as much as he has lost.

The water troubles of these landowners are from two sources—the overflowing of the Des Moines River and the freshets in the creeks. The first is the more serious and the

more frequent. Two or three times since plaintiff acquired his land the water has run over the floor of the lower bridge, knee deep. This bridge is about 20 feet long. It is now about 4 or 5 feet above the creek bed, but because of filling, the bridge has been raised and the floor elevated three times. In 1934 the creek C overflowed its left bank and poured into the bottom. Plaintiff then built a log-and-board levee along the creek bank north of the bridge, which was reinforced with dirt, to confine the water to the creek bed. Five or six years later the levee was rebuilt by team and scraper. The cause of the overflow was due to its large volume and the filling of the creek bed below the bridge. Thereafter the water of the creek ran northwest along the east side of the highway for 300 feet, and then most of it turned northeasterly and easterly, along a furrow, which gradually washed deeper, until the water reached the middle of the slough and flowed down the swale southeasterly. The water eroded the swale to its present width and depth. The dotted line on the outline drawing in the northeast corner of Section 26, curving from the lower bridge to the common corner of the sections, shows the course the water from creek C has taken since 1934. After reaching the swale the water continues southeasterly, and crosses the boundary line between the land of the parties, about 400 feet north of the creek bed. The water then crosses defendant's land at about its east line and re-enters the creek bed. However, as noted above, all of the creek water does not come southeasterly down the swale, but a smaller part goes northwesterly up the swale to the old lake bed. All of this bottom land is underlaid with sand and gravel and all of the stagnant water, which remains in the depressions after the freshets and floods subside, gradually seeps away. During the earlier years the bottom land was usually flooded from the river by overflowing the banks in the vicinity of the mouth of Sugar Creek, or by the water backing up in Sugar Creek and overflowing its banks and running southeast over the entire bottom. It also backed up through Rabbit Gully. Now it also overflows on plaintiff's land farther down the bend in the river. The crop damage is largely caused by the river overflow, as the creek freshets usually do not remain long

enough on the fields to destroy the crops. The slough, of course, was never cropped.

The creek B is shown on Exhibit B, a plat of the township, torn from a county plat book, as being a branch of creek C, but the testimony indicates that it has for many years drained to the northwest into the old bayou or lake bed.

Defendant bought his land in 1945. Shortly thereafter he and plaintiff began discussing the advisability of constructing a levee, to protect their land from the river overflow, commencing on defendant's land about 60 rods east of the partition line of the parties and about 40 rods north of the north line of Section 25. The plan was to extend the levee from defendant's land and across plaintiff's land, south around the bend in the river, and up along the river northwesterly toward Sugar Creek, if the upper landowners wished to join with them. Defendant told plaintiff that he knew of a dragline operator— Mr. Marmon—who was available, but who did not wish to move his machine 80 miles unless there was enough work to warrant it. Defendant testified that plaintiff agreed to build his levee even though the upper owners would not join, and told defendant to have Marmon come on with his outfit. Plaintiff denied this. The trial court stated that defendant was justified from his conversations with plaintiff in having Marmon come on and start the levee. A meeting was had with the upper landowners but they were hesitant about the undertaking. A survey of the proposed levee was made on plaintiff's land. When defendant asked him for a definite answer he proposed that defendant contribute $500 to plaintiff's expense. Defendant told him he would not give him a nickel. Plaintiff said he would talk to Marmon. He did and Marmon told him what his total charge to him would be. Plaintiff gave him no answer. Defendant then constructed his east-west levee 1,050 feet to within 50 feet of plaintiff's line, and after waiting two or three days to hear from plaintiff, he directed Marmon to construct a north-and-south levee from the west end of the east-west levee along and about 50 feet within his west line. This was in July 1946. When he had proceeded with this levee across the

swale, and was approaching the creek, plaintiff asked him if he intended to build it across the creek bed. Defendant told him that he was going to construct it to the bluffs about 200 feet south of the creek, but would put in a culvert and a floodgate in the creek bed. Plaintiff told him that this was objectionable to him, and that he would enjoin him, which he did.

Defendant had previously constructed a corduroy causeway across the bed of the creek, on which he had laid a 30-inch corrugated culvert, over which he had built a dirt-and-gravel crossing. This was about 300 feet east of the levee.

Plaintiff's petition and amendment alleged that the levee as proposed and the causeway as constructed would obstruct the only natural water drainage course over and through his land, to his great and irreparable damage. He prayed for a temporary injunction "restraining the defendant from the construction or maintenance of said levee, either with or without culvert and trap-door in the bed of and over and across said creek, and that defendant be restrained from in any manner obstructing or maintaining an obstruction of the natural course of the water flow of said creek from plaintiff's farm lands." After a hearing the temporary injunction was granted enjoining the construction of the levee or other obstruction on or across the creek, and directing the removal of any dam or obstruction then across said creek and interfering with the natural flow of water in said creek.

The rectangle in heavy lines extending from Section 24 into Section 25 represents the levee as constructed. The two small curved lines intersecting the line of the creek just east of the lower end of the north-south levee indicate the crossing or causeway in and across the creek bed. The north-south levee is about 1,700 feet long. Its south end is 15 or 20 feet north of the creek bank. Defendant's engineer took numerous elevations on the ground. He took as his datum plane an assumed elevation of 50 on the bench mark in the root of a twenty-inch oak tree near the southwest corner of the SE¼ of SW¼ of Section 24. The elevation in the bottom of the creek bed just south of the levee is 45.1. Near by on the creek bank the elevation was 50.6, or 5.5 feet higher than the bottom of the

creek. Right under where the levee is constructed across the deepest part of the swale or slough the elevation was 48. This is about 400 feet north of the creek. The elevations taken north on the surface of the ground to the north end of the levee vary somewhat, because of depressions, to an elevation of 51.5 at the right angle of the intersecting levees. The top of the levee has a grade elevation of 56 throughout, but its height varies according to the elevation of the ground. Where it stopped at the south end it is 5.1 feet in height; at the swale in the slough it is 7.7 feet; at the right-angle junction with the east-west levee it is 4.8 feet; and at the east end of the east-west levee it is 2 feet. The dirt for the levee was taken from a borrow pit between the levee and defendant's west line. The depth of the ditch from which the dirt was taken varies with the height of the levee, being deepest where the height is greatest. The elevation of the swale in the slough at the division line of the parties' farms is 48.5. Up the swale at the common corner of the sections it is 51.0. Proceeding farther northwest in the swale the elevations are 50.6, 50.3, and 49.9 where the water from creek B goes northwest. The elevation where the creek goes under the lower bridge is 54.7 and the top of the creek bank there is 57.7. Under the upper bridge the elevation is 53.1 and that of the top of the bank is 59.2. The elevations along the top of the riverbank from the south point of the bend vary from 51 at that point, up the west side of the bend to about 53 south of Sugar Creek outlet. An elevation in the bed of the creek 275 feet west of the causeway crossing is 45.1. Just east of the crossing, in the creek bed, the elevation is 45.5, and the elevation farther east in the creek shows increased filling. The bed of creek C from the lower bridge to the south end of the levee is completely filled and large trees and underbrush are growing in it. Some water flows in the creek bed at and east of the south end of the levee.

The evidence, quite without controversy, is that the great bulk of the water which comes under the lower bridge passes southeast down the swale. Some of it goes northwest up the swale. But very little goes through the creek at the south end

of the levee. After crossing defendant's land, the water in the swale ultimately reaches the Des Moines River. The levee as it now stands completely blocks the passage of both the creek water and the river overflow from plaintiff's land through the bottom and swale and across defendant's land, except through the space between the south end of the levee and the bluffs to the south. If it were only the creek water the damage might not be serious, because a number of witnesses who had lived in the neighborhood for many years testified that they had seen no water flowing in the creek bed except when the Des Moines River was overflowing. One farmer said that during such an overflow he walked across the causeway constructed by defendant, and the water came to his waist, but as he attempted to cross the swale, below where the levee is now, the water reached his chin, and he went back as the water was getting still deeper. The levee during such an overflow would very likely cause damage to the plaintiff and upper landholders. The defendant concedes this to be true, and he could hardly do otherwise, but he pleaded and testified that he would prevent this by constructing a ditch on his land from the creek through the borrow pit west of the levee to beyond the end of the north-south levee and on north to an outlet in the Des Moines River. This ditch to be of sufficient fall and size to carry away all river overflow and creek waters in time to relieve plaintiff's land and his own land from water damage. Some of the witnesses thought this could be done. So also did his engineer, but he was neither confident nor convincing. Such a ditch would begin at the creek bottom, where the elevation is 45.1. It would be approximately 3,000 feet long. The elevation at the outlet would necessarily have to be lower than that of the creek bed. The elevation of the top of the riverbank at the outlet of the ditch is 53.0, or an elevation 7.9 feet higher than that of the creek bed. The outlet would have to be deeper than 7.9 feet to afford sufficient grade for adequate flow through the ditch. Defendant did not offer evidence of what the dimensions and fall of the ditch would and should be. Plaintiff testified and contends that such a ditch would simply afford more ready access of river floodwaters to the low farm lands than if it

were not there. Defendant has denied this but has offered no reasons in support of the denial. With the riverbank at its present height it is a protection to the bottom land until the water in the river rises above and flows over the bank. A lowering of the bank or the opening of a ditch through it would apparently let floodwaters through before they had reached an elevation of 53. Certainly, with the waters in the river at an elevation of 53, no water could flow out of the ditch. This is exemplified by the Sugar Creek drain. It works very well when the water in the river is below the outlet of the drain, but, according to the testimony, when the river overflows its banks, it backs the water up in the creek until it floods the bottom land below.

In his answer defendant denied that the construction of the levee and the ditch as planned will increase the damage which plaintiff has always suffered from floodwater prior to the construction of the levee. He also alleged that the plaintiff estopped himself to receive the relief he demands by his conduct in inducing defendant to begin the construction of the levee on his land and then refusing to construct a levee on his own land.

The trial court found that the area involved naturally drains to the southeast corner of plaintiff's farm; that the levee as now constructed will not do very much harm to the plaintiff or his crops, but that such harm will be done by extending the levee across the creek; that the construction of a ditch along the borrow pit and on north to the Des Moines River will not be practicable because of the higher elevations near the river. It was the conclusion of the court that defendant was required to take care of the water which came upon his land in the course of nature, and that he could dispose of it as he saw fit so long as he did not cause it to back up and damage the owner above him. By its decree the court enjoined the construction of the levee across the creek, and the construction of the ditch north to the Des Moines River, and directed the removal of the causeway crossing in the creek bed east of the partition line, but permits the defendant to con-

struct such a crossing, providing adequate passage is left for water passing under the crossing. The court also decreed that:

"The defendant's levee will be permitted to stand as it is, provided that he make adequate provision through the borrow pit so that the water in the slough north of the creek can pass south through the borrow pit into the creek."

The defendant's propositions relied on for reversal are: (1) The decree violates the principle that surface water may be repelled in the interest of good husbandry where it does not materially damage other lands, or that question is problematical, or the injured party has an adequate remedy at law (2) the court erred in holding that defendant did not have the right to protect himself from the artificial conditions created by human agencies (3) the court erred in granting a mandatory injunction requiring the removal of the causeway or crossing (4) the court erred in holding that plaintiff had not estopped himself (5) the court erred in holding that the plaintiff did not have a right to protect his land from ordinary floodwater as long as he did not unreasonably injure the plaintiff, especially as the plaintiff had refused to co-operate in a common work for the protection of both farms.

I. The controlling issues in this case are largely those of fact. Controversy over waters and watercourses, and the drainage, interception, and diversion of waters of various types has been a prolific source of litigation, both trial and appellate, in Iowa. The pertinent principles of law have been discussed and stated many times by this court.

In Proposition 1 defendant contends that he has a right to repel "surface water," and in Proposition 5 he makes the same contention as to "ordinary flood water." The character of the water was not stressed nor treated separately in the trial of the case. Neither party based any distinctive right upon the fact that part of the water was "surface water" and part was "flood water." Rain and snow, of course, fell upon this bottom land, and water trickled in from the higher surrounding ground, but the water principally involved herein is water brought in by creeks with well-defined beds and banks,

and flood or overflow water by the Des Moines River in times of high water. "Surface waters" have been described, as the term indicates, as water on the surface of the ground of a casual or vagrant character following no definite course, of a more or less temporary existence, which spread at random over the ground and are lost by percolation into the soil and by evaporation. They are to be distinguished from the water of creeks, streams, rivers, ponds, and lakes, having a substantial existence and a substantially definite location. 30 Am. & Eng. Ency. of Law, Second Ed., 323, 324. Justice Dillon, in Livingston v. McDonald, 21 Iowa 160, 167, 89 Am. Dec. 563, 566, said:

"* * * that the owner of the higher land has an *unqualified right* to drain for agricultural purposes his *surface water,* i. e., water flowing in no regular and definite channel * * *."

In Tretter v. Chicago G. W. Ry. Co., 147 Iowa 375, 381, 126 N. W. 339, 342, 140 Am. St. Rep. 304, the court said:

"That the water after a rainfall gathered in a stream was the only inference to be drawn from the evidence and as such flowed through a depression or swale beneath the bridges, and there is no ground for the suggestion that the water was in a diffused state and not so gathered in a course or stream as to exact the duty of defendant in making the improvement to avoid unnecessary injury to plaintiff's crop."

See, also, Wharton v. Stevens, infra, 84 Iowa 107, 112, 50 N. W. 562, 15 L. R. A. 630, 35 Am. St. Rep. 296.

Whether the floodwaters overflowing the banks of a creek or a river are to be regarded as surface water, or as water of the stream, is a question on which the decisions generally are not in harmony. We need not decide that question in this case. But we may note that in Morris v. City of Council Bluffs, 67 Iowa 343, 346, 25 N. W. 274, 275, 56 Am. Rep. 343, the city, in putting its streets to grade, failed to confine the overflow waters of Indian Creek, and they ran upon the below-grade property of the plaintiff. In holding the city not liable, the court said:

"Such water is practically surface water. It occupies, temporarily, land used for other purposes. The right to divert or impede its flow is quite different from the right to divert or impede the flow of water in its channel. * * * Overflowed water is an outlaw, tending to interfere with the legitimate use of the land which it overflows." Cited in Keck v. Venghause, 127 Iowa 529, 532, 103 N. W. 773, 4 Ann. Cas. 716.

It must be recognized, however, that the rule respecting control of waters as applied to cities and towns is more liberal to them than to nonurban owners similarly situated. In Sullens v. Chicago, R. I. & P. Ry. Co., 74 Iowa 659, 665, 38 N. W. 545, 548, 7 Am. St. Rep. 501, where the defendant had built an embankment across a wide creek bottom, thereby confining the flowage to the creek bed proper, which opening was insufficient to carry the augmented, high-water volume, the court, in speaking of an instruction with respect to overflow waters which the embankment had forced back into the creek, said:

"The theory of the instruction appears to be that, when the overflowed water is turned back into the stream, it ceases to be surface water. This seems to us to be correct. Jones v. Hannovan, 55 Mo. 462."

And the court decided that the defendant should have provided a passage sufficient to carry not only the waters normally carried in the creek bed but also any floodwaters reasonably to be expected. In Downey v. Phelps, 201 Iowa 826, 828, 208 N. W. 499, 501, the court seems to have distinguished surface water proper from overflow, backwater, freshets, and floods, in saying:

"We are satisfied from the record that the evidence sufficiently shows that the construction by the defendants of the dike in question does not materially and substantially interfere with the ordinary flow of what may properly be termed surface water: that is, the water that falls upon the plaintiffs' lands from natural rainfall, without consideration of overflow or backwater from the river or freshets or floods."

Except when the bottom land, involved herein, is inundated by floodwaters from the Des Moines River, the water from the

creek and from rainfall is principally confined to the swale in the lowest part of the bottom. This swale just above the levee, in its bed has an elevation of 48.5, and just below the levee the elevation of the bed is 48.0. At either side of the bed on top of the ground the elevation is 50.07. The depth of the swale at this place is a foot or more. Defendant's engineer testified that the water evidently had flowed in the swale with considerable current. This is the evidence of the witnesses without exception, all of whom were familiar for years with the location. It has often been said that it is essential that a watercourse have a definite channel with a bed and banks or ·sides. Such a definition was given in Falcon v. Boyer, 157 Iowa 745, 750, 142 N. W. 427, 429, wherein we stated:

"A water course is defined as a natural stream of water usually flowing in a definite channel, having a bed and sides, or banks, and discharging itself into some other stream or body of water."

In Hinkle v. Avery, 88 Iowa 47–54, 55 N. W. 77, 45 Am. St. Rep. 224, there is a general discussion concerning what is a watercourse. A number of authorities and decisions are cited and quoted which support the definition in Falcon v. Boyer, supra. In the Hinkle case, supra, the water sometimes ran in a defined channel and at other places spread out irregularly in a meadow without banks or channel, but it at all times had a visible and distinctly traceable current. The court held it was a watercourse and enjoined its obstruction.

But our decisions leave no question or doubt about the matter. A definite channel with well-marked sides or banks is not essential to a watercourse. A swale is a natural watercourse. In interpreting the terms "natural watercourse or depression" in chapter 70, Acts of the Thirtieth General Assembly, now section 465.22, Code of 1946, the court, in Hull v. Harker, 130 Iowa 190, 192, 193, 106 N. W. 629, 630, involving a natural swale, said:

"It is the natural water course for the drainage through plaintiff's land of the surface water from the lands of defendants

and others \* \* \* That the swale which we have referred to constitutes the 'natural water course' or the 'natural depression' referred to in the statute is plain from the evidence. To constitute a natural water course, it is not necessary that the flow of water through it shall have been 'sufficient to wear out a channel or canal having definitely well-marked sides and banks. . . . . . If the surface water in fact uniformly or habitually flows off over a given course having reasonable limits as to the width, the line of its flow is, within the meaning of the law, applicable to the discharge of surface water, a watercourse.' Lambert v. Alcorn, 144 Ill. 313 (33 N. E. 53, 21 L. R. A. 611).''

In Parizek v. Hinek, 144 Iowa 563, 565, 123 N. W. 180, 181, and in Heinse v. Thorborg, 210 Iowa 435, 437, 230 N. W. 881, this court said:

''It is the rule of this state that a swale or depression through and over which surface water runs according to. the laws of nature is a watercourse, even though this depression or swale has no well defined banks.''

There is a like holding in Miller v. Hester, 167 Iowa 180, 183, 149 N. W. 93. See, also, Tennigkeit v. Ferguson, 192 Iowa 841, 844, 185 N. W. 577; Besler v. Greenwood, 202 Iowa 1330–1332, 212 N. W. 120; Nelson v. Omaha & C. B. St. Ry. Co., 158 Iowa 81–84, 138 N. W. 831; Clark v. Pierce, 224 Iowa 1068, 1069, 277 N. W. 711; Durst v. Puffett, 181 Iowa 14–16, 163 N. W. 201; Vannest v. Fleming, 79 Iowa 638, 641, 44 N. W. 906, 907, 8 L. R. A. 277, 18 Am. St. Rep. 387 (where the court, in words applicable to the case before us, said: ''The case is not one of water, which would not naturally run upon defendant's land, being diverted and brought there by the unlawful acts of plaintiff, but is simply the case of the natural drainage of a tract of land through the swales prepared by nature for that very purpose.''); Herman v. Drew, 216 Iowa 315, 317, 249 N. W. 277, 278 (the court said: ''It is also the duty of the owner of the servient estate not to obstruct the flow of surface waters in their natural course, even though they have no well-defined banks.'')

██ If it be conceded that the water which defendant seeks to repel be surface water, as he contends, nevertheless, since it flows in a watercourse, a swale provided by nature, he has no right to obstruct its passage. This proposition is ably discussed in Wharton v. Stevens, supra, 84 Iowa 107, 110–114, 50 N. W. 562–564, 15 L. R. A. 630, 35 Am. St. Rep. 296:

"The controlling question in the case involves the right of the defendant to maintain the dam across the ditch and swale, so as to interfere with the free flow of water from the plaintiff's drains. It must be kept in mind that the ditch in question was the result of the action of the water in accord with nature's laws, and that the swale was the water course provided by nature for the escape of water from the plaintiff's land. * * * The water caused by the swales is called by counsel 'surface water,' and this talismanic word seems in some cases to take the place of reason and principle in the support of the right of the lower proprietor to throw back upon the higher land the water flowing in ditches washed out by the natural action of the water. The books often announce the rule that the landowner may fight surface water, which is a common enemy, and keep it off his land, and even throw it upon his neighbor, or back upon the land from which it flows. *But the books do not hold that this may be done when there is a waterway over which the water naturally flows.* * * * When such water flows by a well-defined and natural course upon lower lands, that flow cannot be interfered with by either the upper or lower proprietor. But when such water has no defined course, but spreads out over the land without a well-defined course, it may be turned by the landowner in any direction. *But where the surface water has a fixed and certain course, as a swale, though it may be narrow or broad, its flow cannot be interrupted to the injury of an adjoining proprietor.* * * * This court is not prepared to hold, on the ground that the designation 'surface water' is applied to the water flowing in the swale, that though flowing in a well-defined course, with a fall which gives it current sufficient to wash out the ditch, it may be dammed so as to throw it back upon the plaintiff's land, and prevent the proper use of the

tile drains. The words 'surface water' have no such magic influence as to demand the recognition of rules that would work gross injustice, and arrest the improvements and progress in the cultivation of agricultural lands. As we have intimated, consideration of the books will reconcile the seeming conflicts upon this point. To effect such reconciliation, it is only to be mentioned that the authorities all hold that when water, be it surface water, the result of rain or snow, or the water of springs, flows in a well-defined course, be it in a ditch or swale, in its primitive condition, and seeks discharge in a neighboring stream, its flow cannot be arrested or interfered with by the landowner, to the injury of the neighboring proprietors." (Italics ours. Citing numerous supporting authorities.)

It is not important how we characterize or label the waters which pass over the Hunt and Smith land. Terminology is not material in describing water which flows over these lands in the course provided by nature. The fact that it is floodwater, creek water, or rain, is of no consequence. It all causes injury when its flow is obstructed. In a like case, Brown v. Armstrong, 127 Iowa 175, 177, 102 N. W. 1047, quoted in Fennema v. Menninga, 236 Iowa 543, 19 N. W. 2d 689, the court said:

"The rules of law for such cases are well understood. While surface water has been spoken of in the books as a common enemy, it is well established in this State that when water, *no matter what its character, flows in a well-defined course, be it only in a swale,* and seeks discharge in a neighboring stream, its flow cannot be arrested or interfered with by one landowner to the injury of another." (Italics ours. Citing Iowa decisions.)

█ Nor can a riparian owner construct a levee against the natural overflow of the stream when it will cast an increased volume of the overflow upon the land of another to his injury. Keck v. Venghause, supra, 127 Iowa 529, 103 N. W. 773, 4 Ann. Cas. 716. It is clear under the record that plaintiff's land is the dominant estate. Defendant concedes this fact. His land, as the servient estate, therefore owes a servitude to plaintiff's land to receive all water, whether surface or flood water, as it

is shown by the evidence to pass therefrom to defendant's land. The plaintiff as owner of the dominant estate is entitled to all the natural advantages of the location and contour of his land.

Many decisions of this court sustain the conclusions just noted. In addition to cases already cited, see, Jacobson v. Camden, 236 Iowa 976, 20 N. W. 2d 407; Bramley v. Jordan, 153 Iowa 295, 133 N. W. 706; Young v. Scott, 216 Iowa 1253, 1254, 250 N. W. 484; Willitts v. Chicago, B. & K. C. Ry. Co., 88 Iowa 281, 55 N. W. 313, 21 L. R. A. 608; Moore v. Chicago, B. & Q. Ry. Co., 75 Iowa 263, 39 N. W. 390; Houghtaling v. Chicago G. W. Ry. Co., 117 Iowa 540, 91 N. W. 811; Guy v. Payne, 195 Iowa 1045, 191 N. W. 991; Walters v. City of Marshalltown, 145 Iowa 457, 460, 120 N. W. 1046, 26 L. R. A., N. S., 199; Pascal v. Donahue, 170 Iowa 315, 152 N. W. 605; Noe v. Chicago, B. & Q. Ry. Co., 76 Iowa 360, 41 N. W. 42; Hayes v. Oyer, 164 Iowa 697, 146 N. W. 857; Pohlman v. Chicago, M. & St. P. Ry. Co., 131 Iowa 89, 92, 107 N. W. 1025, 6 L. R. A., N. S., 146; Pate v. Rogers, 193 Iowa 726, 187 N. W. 451; City of Waverly v. Page, 105 Iowa 225, 74 N. W. 938, 40 L. R. A. 465.

II. Proposition 2 is based upon the claim that the natural course of the water was diverted by human agencies, which justified defendant in constructing the levee. As we have noted herein, prior to 1934 the bed of creek C below the lower bridge had filled through natural causes, and thereby forced the waters of the creek into the bottom. Plaintiff threw up a levee parallel to the creek above the bridge to turn the water back into the creek. He was unsuccessful in this because there was no other place for the water to go except into the bottom, where it followed a dead furrow to the swale, down which it thereafter has continued to flow. It is self-evident that the result would have been the same had the plaintiff done nothing. Defendant's contention is without merit.

III. Defendant also urges that plaintiff is not entitled to injunctive relief because he has an adequate remedy at law. His only other remedy would be actions for damages as often as he was injured by the obstructed waters. This would not be

adequate relief and might require a multiplicity of actions. He is entitled to speedy and conclusive action. Defendant has trespassed upon him and will continue to do so. It is a reasonable conclusion that a levee, over 100 rods long, approximately 5 feet high at each end and 8 feet high in the middle, will greatly obstruct the flow of water and will retard it on plaintiff's land for a longer time, to a greater extent and depth, than would occur if the levee were not there. It is fairly evident that substantial injury would be done plaintiff. Equity has never been hesitant in granting relief by injunction under such circumstances. See Jacobson v. Camden, supra, 236 Iowa 976, 20 N. W. 2d 407; Holmes v. Calhoun County, 97 Iowa 360, 363, 66 N. W. 145; Troe v. Larson, 84 Iowa 649, 652, 653, 51 N. W. 179, 35 Am. St. Rep. 336, and authorities cited. Plaintiff was entitled to injunctive relief.

IV. What we have already said answers defendant's complaint against the granting of a mandatory injunction requiring the removal of the crossing from the creek bed. This is particularly true since the court gave defendant the option of leaving the levee intact, provided he furnished adequate passage of all water across plaintiff's land through the borrow pit and around the south end of the levee. More certain relief would probably have been effected by directing the removal of the levee, but plaintiff did not pray for it expressly, although asking for general equitable relief, and he did not appeal. If the levee were removed the crossing would not be an appreciable obstruction either to creek water or to the river overflow, but if much of the water must pass around the south end of the levee it might be a substantial interference. There is no error in the court's order.

V. Defendant's contention that plaintiff had estopped himself is not tenable. Each party has cited authorities on the subject of estoppel. Among them, Smith v. Coutant, 232 Iowa 887, 6 N. W. 2d 421; Goodwin Tile & Brick Co. v. DeVries, 234 Iowa 566, 13 N. W. 2d 310, 155 A. L. R. 346; Laughlin v. Hall, 236 Iowa 990, 20 N. W. 2d 415; Riggs v. Meka, 236 Iowa 118, 122, 17 N. W. 2d 101; Bates v. Kleve, 225 Iowa 255, 280

N. W. 501; Holmes v. Curl, 189 Iowa 246, 178 N. W. 406. The principles of equitable estoppel are well settled and the parties are not in disagreement over them. A discussion of them is unnecessary. The evidence does not warrant the enforcement of an estoppel against the plaintiff. It is true that the parties discussed a number of times the matter of building a levee along the right bank of the Des Moines River on their properties. They consulted with various officials in Des Moines about it. Plaintiff may have agreed to the plan. But there is no evidence that the parties at any time ever contemplated the building of a north-south levee across the swale. Plaintiff, by word or act, never committed himself to such a project, nor led the defendant to believe that he was in favor of it. It was only after plaintiff failed to definitely close the agreement with Marmon, and defendant refused to contribute $500 to plaintiff's expense, that defendant decided to build the north-south levee. Plaintiff had no knowledge of it and in no way misled or induced defendant to construct it. With respect to the north-south levee and the crossing in the creek bed, the plaintiff made no false representation to nor concealed any fact from the defendant, with the intention that he rely and act thereon. Nor was there any such reliance or action. Defendant failed to establish any of the essential elements of equitable estoppel against plaintiff's right to sue or to obtain decree as rendered.

We have considered and passed upon every proposition relied on for reversal and it is our conclusion that they do not warrant such an order. The judgment and decree is therefore—Affirmed.

OLIVER, C. J., and HALE, GARFIELD, SMITH, MULRONEY, MANTZ, and HAYS, JJ., concur.