A. H. BOAT et al., appellants, v. HERMAN VAN VEEN et ux., appellees.

No. 47754.

(Reported in 44 N.W.2d 671)

NOVEMBER 14, 1950.

Siegers & Bedell and Arnold H. Myhra, all of Newton, for appellants.

Life & Davis, of Oskaloosa, for appellees.

SMITH, J.—The history of the situation culminating in this suit commences in 1915. In that year the Jasper County Board of Supervisors, acting as drainage commissioners, straightened the channel of the South Skunk River in the vicinity of the land now owned by these parties. They constructed the "Skunk River ditch" and established Drainage District No. 5 from Colfax down to the south line of the county.

Defendants own the southeast quarter of section 31, township 78, range 18, along the southern border of the county, bounded on the south by county road 396 which comes from the west to a point somewhere on the south line of their southeast forty where it turns north across the forty and then goes on east into the adjoining section and across the river.

The South Skunk River ditch comes down from the northwest, close to the northeast corner of defendants' one hundred sixty acres, through a forty north of it owned by defendant Herman Van Veen (SE¼ NE¼, Sec. 31), thence southeasterly and across county road 396 where there is a county bridge hereinafter referred to as the "county line bridge."

In 1918 Drainage District No. 9 was organized and a ditch constructed from a bayou of the river near the northeast corner of the quarter section above described (now owned by defendants) and extending west along the center line of section 31, being the north line of defendants' said quarter section and plaintiff Boat's eighty acres directly west of it (N½ SW¼, Sec. 31). At the west line of section 31 it is crossed by a north-and-south road (county road 151) and continues southwesterly, a half mile, thence westerly across section 36 in range 19. Plaintiffs own land variously situated both north and south of the ditch, some touching it and some merely in the vicinity. The lands of plaintiffs Boat, Van Vark and Dykstra are in section 31, those of the other plaintiffs lie west of the county road 151, in sections 36 and 25, range 19. Plaintiff Van Vark also owns the extreme southeast forty in section 36.

There is a levee or dike along the south edge of the ditch above described in section 31. Defendants contend it was created by the dirt excavated in the construction and maintenance of the ditch. Plaintiffs claim the dirt was not placed in the form of a levee when the ditch was dug but put in piles along the south edge, which have since been consolidated and pulled together by defendants to form a continuous dike or wall. Plaintiff Boat testifies this was done by defendant Herman Van Veen along defendants' land in 1945, and by himself, in self-defense, along the north side of his eighty in 1948. He pleads and testifies to an offer to remove his part upon the abatement of the part maintained by defendants.

Defendant Herman Van Veen, on the contrary, says when he moved on the farm fourteen years before the trial the dike was already level on the top, three or four feet high, that the county added to it when they cleaned out the ditch and "throwed the heaps on top of that again." He says plaintiff Boat "planed his part off before I did. Then afterwards I leveled those addi-

tional heaps on top of my dike to cut the weeds on it. After it was leveled down I would say it was five or six feet high. * * * It was twelve years ago that the county put that last bunch of dirt on top of that dike."

The general direction of drainage in that area is from northwest to southeast as indicated by the river course. Plaintiffs' engineer testifies the fall in the ditch was a tenth of a foot to a hundred feet. It seems clear that while defendants' quarter section is servient to much of the land of plaintiffs the drop is slight from northwest to southeast. The entire area is low.

The valley down which the river runs is evidently broad and low and in times of high water it overflows to a considerable width. The river ditch (No. 5) cannot carry it. Drainage ditch No. 9 did not extend east clear to the river ditch but was "outletted" into an old bayou on the northeast part of defendants' quarter section.

The engineer in charge of the work in 1918 says the dirt from the ditch was placed in piles along the south edge "to keep it from being washed into the drainage ditch." He testifies: "The piles of dirt were not continuous only at the bottom of the piles and they did not naturally over the period of years become a continuous levee and dike. It is now a dike but by whom that was done or when I do not know."

In 1937 Drainage District No. 21 was established. It comprised the same territory as in District No. 9 except that the ditch was carried on southeast to the river ditch. The engineer says "additional territory was added between the end of the old ditch No. 9 and the river."

We shall refer to the dike along the south side of the ditch as a "levee." In 1945 defendants built a dike from the east end of this levee extending in a southerly direction roughly parallel with the river to county road 396 west of the river bridge. This last-mentioned dike we shall call a "wing dam" and avoid some of the confusion found in testimony and argument caused by treating the two as one structure or as two levees. This "wing dam" is entirely on and across the northeast forty of defendants' quarter section.

There is a bluff on the easterly side of the river opposite the lower or southerly end of this wing dam and plaintiffs con-

tend the construction of the wing dam creates a narrow channel at that point, insufficient as an outlet for. floodwaters which formerly spread out practically over defendants' entire quarter section. They say these waters now back up to the north and, being kept by the east-west levee along the south side of the drainage ditch from passing south over the lands of defendants and plaintiffs Boat and Van Vark in the south half of the section, spread over the lands of plaintiffs Boat and Dykstra in the north half of section 31 across the county road 151 and over the lands of plaintiffs in sections 36 and 25, thence down in a southerly direction to county road 396 and over it back eastward to the river.

Plaintiffs argue that since their lands in sections 25, 36 and the north half and west half of section 31 are dominant and defendants' land is servient, the defendants, by the construction and maintenance of the levee and wing dam, are avoiding the burden the law places on servient estates to accept water coming down in its natural course. They ask that both the levee and wing dam be abated and defendants enjoined from maintaining them. They claim their lands are damaged by these structures and plaintiff Jasper County claims damage to both county roads 151 and 396.

Defendants admit responsibility for the dike we call the "wing dam" but claim the levee along the south side of the drainage ditch was caused by the construction and maintenance of the ditch and has existed so long that it constitutes a part of the drainage district system if not originally a part of it. They also deny that either the levee or the "wing dam" is the cause of any flood damage suffered by plaintiffs.

The trial court denied plaintiffs any relief and they appeal.

I. It will be seen the controversy is largely, if not entirely, one of fact. The rules of law applicable to dominant and servient estates are too well-settled to require extensive restatement. In Fennema v. Menninga, 236 Iowa 543, 545–547, 19 N.W.2d 689 (involving a situation immediately south of the one involved here), we stated both the common-law and civil-law rules and reviewed our own decisions which do not adopt either in its entirety (Matteson v. Tucker, 131 Iowa 511, 516, 517, 107 N.W. 600, 602). The rule stated in Brown v. Armstrong, 127

Iowa 175, 177, 102 N.W. 1047, is approved to the effect that the natural flow of water cannot be arrested or interfered with by one landowner (whether servient or dominant) to the injury of another. Other quite recent cases are: Grimes v. Polk County, 240 Iowa 228, 232, 34 N.W.2d 767, and Hunt v. Smith, 238 Iowa 543, 554 et seq., 28 N.W.2d 213.

II. We have then to determine whether defendants erected or are responsible for the levee (along the south side of the drainage ditch) and, if so, whether it and the wing dam together constitute a nuisance of which plaintiffs may complain; whether the levee has existed so long substantially in its present form as to preclude its mandatory removal now; whether if the levee be not now subject to removal (either because it is a part of the original construction of the drainage system or by reason of acquired prescriptive right) the wing dam alone constitutes a nuisance removable at plaintiffs' suit.

We have carefully studied the testimony and the plats submitted by the engineers. The testimony as to conditions existing before 1945 when the wing dam was built would not justify injunctive relief as to the levee lying along the south side of the drainage ditch. There is little if any showing that it causes or has caused damage to the lands of individual plaintiffs or to plaintiff county's roads. Whether this levee was a part of the original construction or came into being later, it has existed in some form for a long period of years, since prior to 1937.

When the ditch was dug in 1918 the dirt was designedly piled on the south bank "to keep it from being washed into the ditch." This implies the water was expected to come into the ditch from the north. The ditch was intended to receive and carry it east, not to mingle it with the additional water from the west and have it overflow the servient land on the south between irregular piles of dirt not calculated to assist the process of orderly drainage. We have a right to assume the ditch was intended to improve the situation of all the land in the district, whether dominant or servient. While there may have been no definite purpose of constructing a levee, it should not be presumed there was an intention to place a heavier or different burden upon the servient estate where the excavated dirt was dumped. Of course it may be presumed the then owners of the

servient estate were allowed payment for the estimated damage to their land by reason of the construction of the ditch, Droegmiller v. Olson, 241 Iowa 456, 466, 40 N.W.2d 292, 299, but not flood damage by reason of water artificially carried on their land.

Subsequent dredging of the ditch resulted in the piling of additional earth along the south side upon defendants' land. The authorities must either have intended a levee or have known the landowners would in self-protection create its equivalent out of the piles left on their land.

Whatever may have been the original intention, section 455.163, I.C.A., now provides:

"The landowner may have any beneficial use of the land to which he has fee title and which is occupied by the waste banks of an open ditch when such use does not interfere in any way with the easement or rights of the drainage district * * *. For the purpose of gaining such use the landowner may smooth said waste banks, but in doing so he must preserve the berms of such open ditch without depositing any additional dirt upon them."

This statute originated in 1924. It seems never to have been construed. An opinion of the Attorney General says the landowner has the statutory duty to cut, burn or otherwise destroy all noxious weeds on such waste banks. Op. Atty. Gen. 1948, page 191. It seems to be applicable here. See section 317.10, I.C.A.

There is no testimony that the subsequent leveling-off process by which defendants' levee became substantially continuous along the top involved the use of any appreciable amount of dirt except what had come out of the ditch. Plaintiff Boat testifies that when he himself "built" the levee along the north edge of his eighty he "used the dirt the county throwed out, and the rest I got out of my own field." But there is no such testimony as to defendants except as to a small quantity used to repair a breach in 1949.

There is no other evidence that defendants did anything to the levee except in 1945 and some repair work in 1948. The man who did the work for them in 1945 testified for plaintiffs. He says on direct examination: "I leveled the mounds of dirt off

and made a levee." On cross-examination he explains: "I repaired the levee for Mr. Van Veen from where the new levee [the wing dam] hits the drainage ditch and west to the fence." (This doubtless means the line fence between defendants' land and plaintiff Boat's eighty west of it.) "At the time I repaired the levee there were three or four piles of dirt at the extreme west end and they covered fifty feet. I recognized it as a levee west [along the north edge of Boat's eighty] from the point where I found the piles of dirt. The heaps of dirt on the east end were piled up five or six feet high above the surface of the contiguous area and the base was below the bank at varying distances." He says (on re-cross-examination) that in repairing the dike south of the drainage ditch, "I didn't raise it at all."

We interpret his testimony as a whole to mean what he said on his redirect: "What appeared to me to be an old levee with the breach in it towards the line fence between the Boat property and the Van Veen property was about two and one-half feet high. When I brought the piles of dirt together on the west end of the drainage ditch and made [them] into a dike that part of it when completed was a little higher—about three feet. I made the dam or levee [wing dam] from the road north to the drainage ditch about three feet high."

We have already referred to the conflicting testimony of plaintiff Boat and defendant Herman Van Veen and have tried to appraise their different versions in the light of the testimony of less interested witnesses. Plaintiff Kinart testifies: "The dirt that was on the south side of the drainage ditch was leveled off when I took it [his present land] over in 1935. It has been leveled off ever since except in the last year." He speaks of a "big flood" in 1944. He said that time the land south as well as north of the ditch was covered.

Plaintiff Vander Pol says the water in 1944 was higher than in 1949. His land was overflowed "slightly." He owned an interest in land in the east half of section 36, both north and south of the ditch, and one hundred twenty acres in the southeast quarter of section 25, north of section 36.

Plaintiff Kaldenberg, whose land is in section 36, describes the flood in 1944 "when the river went out. * * * my land was

flooded with more river water * * * than at any other time since I owned it." He did not see it in 1949. "I was in a truck wreck."

Defendants' son John describes the situation in 1936: "The dike of Van Veen at that time consisted of piles of dirt joined at the base. The piles varied in height but I would say they were on an average approximately five feet high. During the period that I have known it the ditch has been cleaned out once I believe. I think it was the county who cleaned it out. The dirt that came out was piled on the south side up on those piles and all intermixed there with the piles. In my opinion it did form a solid embankment clear through there ever since 1936."

We need not determine just when the piles of dirt became merged into a continuous levee. We think there has been no such substantial change within the period of limitations as to justify a mandatory injunction, even if such decree would be otherwise justified. We would indeed find it difficult to determine to what condition the situation should be restored.

Our conclusion is that whatever defendants did to the levee since their ownership of the land, other than minor repair work, was within the contemplation of Code section 455.163 and has not been shown to be injurious to plaintiffs. As to this levee along the south edge of the drainage ditch, the judgment denying plaintiffs' petition must be affirmed.

III. The situation as to the wing dam is different. Its construction has created a changed condition affecting at least the county's problem of maintaining county road 396 immediately, and for some distance west of the bridge over the river. Whether it is chargeable with any appreciable part of the flood damage suffered by the individual plaintiffs since 1945 may be doubted.

The plat (plaintiffs' Exhibit A) does not make it clear that the elevation of the top of the wing dam would be such as to back the water up, force it around north of the ditch, almost across two sections, thence south to county road 396 and along that road back east to the river below the bridge. That is plaintiffs' contention and we do not believe it is proven. The relative wing-dam elevation is not clearly ascertainable from the plats. No contour map is shown.

But the wing dam does create a narrower course for the floodwater coming down from the northwest than had previously existed. Before its erection the water coming down past the east end of the levee could immediately spread out over defendants' east eighty acres at least and cross the road over a wider segment with much less speed and force. The road maintenance man testifies that whereas they had a two-foot tube there before and it washed out to a width of twenty to thirty feet; now "it would take out anywhere from seventy to eighty, eighty-five feet." He says: "Before the levee [wing dam] was in the water spread out all over the bottom."

The testimony of the county engineer as to the effect of the wing dam on county road 396 is that it "raised the level of the water across the road and caused to wash out more often, made it more impassable than it was before." He says (what to a layman seems reasonable) that without the wing dam the water would spread over a larger area and that by reason of the wing dam the current was increased.

This dam is approximately twelve hundred feet from the bluff east of the river at its nearest point. A study of the physical situation as revealed by the record convinces us that maintenance of the wing dam constitutes an abatable nuisance of which the county may complain. It was constructed in 1945 without authority.

The county line bridge by which county road 396 crosses the river was formerly about two hundred feet north of its present location. In 1937 its superstructure was washed out by flood and the bridge was thereafter rebuilt on its present site. Some of the old piers and piling were left in the river at the old location.

Defendants contend these and not the wing dam and levee were the cause of some high water. They claim ice jams in the spring, causing sudden high water, are the result of these obstructions and, by cross-petition, they prayed for a decree removing them.

The trial court dismissed this cross-petition, and defendants have not appealed. The contention therefore concerns us here only so far as it constitutes an argument against removal of the wing dam.

1162

We think the record does not support defendants' theory as to these vestiges of the old bridge. While there is sufficient evidence to show their removal would be very desirable we do not find their presence in the river constitutes sufficient justification for maintenance of plaintiffs' wing dam.

Upon the entire record we conclude the decree of the trial court should be modified to require defendants to remove the wing dam and affirmed in other particulars.

The decree, modified in accordance with this opinion, will be affirmed. The case will be remanded for such modification, defendants to pay one fourth of costs of appeal. Appellants' motion (submitted with the case) to strike appellees' brief and argument will be denied.—Modified, affirmed and remanded.

All JUSTICES concur except HALE, J., not sitting.