FRED LOGSDON, Appellant, v. GUY B. ANDERSON et al., Appellees.

No. 47114.

(Reported in 30 N. W. 2d 787)

586

FEBRUARY 10, 1948.

REHEARING DENIED APRIL 9, 1948.

Smedal, Maurer & Clark, of Ames, for appellant.

Ed. J. Kelley, of Ames, for appellees.

MULRONEY, C. J.—The land involved in this suit is an eighty-acre tract in Story county. Defendants own a ten-acre tract located in the southeast corner of the eighty and plaintiff owns the balance, or seventy acres, which borders defendants' land on the north and west. The accompanying plat shows the ten-acre tract owned by defendants; the plaintiff's land being to the north and west of the solid lines.

Looking first to existing conditions, about which there seems to be no serious dispute in the record, we find that a stream of water, draining land across the road and to the north and east of the ten-acre tract, flows southwest, through the concrete box culvert under the road, shown at the northeast corner of the plat, and outlets upon defendants' land. The outlet of this tunnel is south of defendants' north boundary line. From the tunnel outlet there is an artificial ditch, located wholly on defendants' land, designed to carry the water straight west until close to the northwest corner of the ten-acre tract where

the ditch turns south on defendants' land and outlets into a bayou of the Skunk River located south and west of the eighty-acre tract. The course of this artificial ditch is shown by the heavy broken line on the plat. This ditch along the top or east-west portion has filled with silt until now the bottom is, in some places, higher than the land on each side of the ditch and the water is only held in the ditch by the banks, formed from the dirt originally thrown up on either side, when the ditch was constructed. In some places the bank on the north

side has given way causing the water in the ditch to flow out over plaintiff's land. While the entire eighty acres is what is termed bottom land, the record shows that plaintiff's land is some, but not much, higher than defendants' land, but in any event it is quite clear from the record that none of the water that flows onto defendants' land at the culvert outlet would ever reach plaintiff's land if there were no artificial ditch on defendants' land. The testimony shows the meandering line leading in a general southwesterly direction would be the course the water would take if it were not for the artificial ditch at the mouth of the culvert.

Plaintiff in effect sued to compel defendants to either clean out the ditch or remove the south bank of the ditch entirely. The defendants' answer alleged that the artificial ditch was dredged in 1944 and that plaintiff's grantor who then owned the seventy-acre tract, now owned by plaintiff, shared one half of the expense of digging the ditch, and they prayed that the court "decree that the plaintiff and the defendants * * * be mutually responsible for the maintenance and care of said ditch." In a later amendment to conform to proof the defendants set up defenses of estoppel and acquiescence. The trial court found that the evidence was insufficient to show any mutual agreement for the maintenance of this ditch but found for defendants and denied injunctive relief on the ground that a system of drainage was established by the acquiescence of plaintiff and his grantors since 1925 or 1926 and that the ditch became a natural watercourse through acquiescence.

The record shows that both parties purchased their respective portions of the eighty acres in 1946, but in 1925 or 1926, plaintiff, while renting the ten-acre tract from one of defendants' predecessors in title, opened the ditch in approximately the present location as shown on the map, at his own expense, by using a team and a plow and by using a shovel in places to clean it out. We need not detail all of the evidence of the various tenants who occupied the ten-acre tract, concerning this ditch. It seems clear that after the ditch was originally opened by plaintiff when he was a tenant, it remained and it was often cleaned out by the various tenants, though some of the later tenants or owners said the north and south ditch had vanished

by the time they entered into possession and only the east-west portion existed. In any event, one Brown owned the ten acres in 1944 and the Griffith estate owned the seventy acres at that time, and plaintiff was the tenant on the Griffith land. G. C. Rorem, who was the agent for the Griffith estate, told Brown that water was flowing out the north bank of the ditch and that his tenant was complaining. Brown contacted a dragline operator and ascertained the cost of digging a permanent ditch would be $150 and he went back to Rorem and proposed that the ditch be dug and that Rorem pay him $75 and Rorem did pay him $75 and the ditch was dug, with a dragline, in its present location. There is no testimony that Rorem agreed to pay half or any portion of the future maintenance, and Rorem expressly testified that he did not so agree. In fact he testified that there had been trouble by the water diverted by the ditch coming onto the Griffith land and that he considered the $75 cheap and that he did not even consult the landowners about paying the $75. Five days after the ditch was dug an extraordinary rain of about nine inches in twenty-four hours occurred. Cornstalks, rubbish and silt were washed into the ditch and land and the highways were flooded. The record shows that plaintiff, then a tenant on the land he now owns, helped in putting the ditch back in shape; that Brown told plaintiff that the ditch was a mutual affair as Rorem had paid half of the construction cost, and that plaintiff thereupon sent two of his hired men to assist in removing a dam that someone had placed in the ditch near the culvert. The evidence rather indicates the plaintiff or one of his hired men had made the dam or obstruction in the ditch. There is no record of trouble with the ditch in 1945 but in June of 1946 the silt had filled the channel of the ditch and the water during heavy rains would run out of the banks and plaintiff's land was flooded. Later that year when plaintiff's land was flooded, he opened up the south bank of the ditch to let the water run off of his land onto defendants' land.

I. Plaintiff assails paragraph 4 of the trial court's findings as being contrary to the evidence. In this paragraph the trial court held:

"The plaintiff and his grantors have acquiesced since 1925 or 1926 in the system of drainage on and across the defendant's land and having originally devised said system the plaintiff is now estopped from claiming that the defendants should drain the surface water flowing onto said lands at the northeast corner in a different manner than by means of this ditch."

Elsewhere in its findings the trial court pointed out that plaintiff "had full knowledge of the ditch, and its use from the time of its original construction" and did not ever object "to the existence or maintenance of the ditch in its present location at any time."

█ The water that is here involved is a stream that flows nearly all the time through the hills off to the northeast, and through the road culvert to defendants' land. Of course defendants can turn the water that comes through the culvert in any manner they see fit on their own land. They do not need to let the water spread out over their land. They can turn it into ditches on their land and divert the flow of water around rather than across the ten acres, so long as they do not cast it upon the lands of adjoining owners, or interfere with the rights of riparian owners. 67 C. J., Waters, section 336; Mickelwait v. Wright, 194 Iowa 1265, 1269, 191 N. W. 291, 294; Miller v. Perkins, 204 Iowa 782, 216 N. W. 27; Falcon v. Boyer, 157 Iowa 745, 142 N. W. 427. In Mickelwait v. Wright, supra, the rule is stated as follows:

"* * * appellant has a perfect right to construct a ditch upon his own land and carry the water upon his own premises in such a manner as he shall see fit to do, *provided he does not cause it to flow upon appellee's land when it would not have done so, but for such artificial construction.*" (Italics supplied.)

It is undisputed in this record that the water from the culvert would not, in the absence of the artificial ditch, go north onto plaintiff's land.

█ II. But the defendants argue, and the trial court held, that defendants' right to carry this water in the artificial ditch on his own land could not be enjoined even though it caused the water to be diverted upon plaintiff's land, because plaintiff

had acquiesced "in the system of drainage" and was now estopped from claiming defendants should drain the water off in any other manner. The burden of proof upon this issue was on defendants. 31 C. J. S., Estoppel, section 160.

The trial court's findings and defendants' argument indicate the estoppel is grounded on (1) testimony that plaintiff originally constructed the ditch (2) testimony that plaintiff had knowledge of and was familiar with its existence since 1925 or 1926 (3) testimony that plaintiff had assisted in the repair of the ditch (4) testimony that one half the expense of the reconstruction of the ditch in 1944 was borne by plaintiff's grantor, and (5) testimony that neither plaintiff nor his grantors ever objected to the existence or maintenance of the ditch in its present location.

The fact that plaintiff originally constructed this ditch when he was a renter of the ten-acre tract in 1925 or 1926 is immaterial. Clearly it was constructed for the benefit of this ten-acre tract he was renting so that the water coming through the culvert would not spread all over the tract but would be conducted around the cultivated ground. He, as the occupier of the ten-acre tract, was merely exercising good husbandry, and the right given by law to divert the flow of water around rather than across the land where it would normally go. The mere fact that he originally constructed and maintained the ditch while he was in possession of the ten-acre tract would not work an estoppel against him when later tenants or owners allowed the ditch to become channel full of silt so that water was diverted upon land he later bought. Defendants took title to their land burdened with the water that flowed onto it from the culvert. They could choose to use the conversion ditch previously constructed or they could eliminate the ditch, and avoid the work of maintaining it, and let the water flow southwest across their land. It matters not who constructed the ditch. This is not a case of a ditch constructed by a common remote grantor. Defendants' rights and duties would be the same if they had constructed the ditch.

It is true plaintiff knew of the ditch since 1925 or 1926 when he constructed it. He farmed the land, he later bought, for about twenty years. He knew all about the ditch but his

mere knowledge of a ditch on defendants' land by which the owners of that land are diverting surface water, gives no rise to an estoppel. It cannot be said that he acquiesced in the drainage system on defendants' land. There was nothing he could do about it. As stated the various owners of the ten-acre tract could divert the water that came through the culvert without plaintiff's consent. It was not until 1944 that we find plaintiff, then a tenant, complaining to his landlord that the ditch was causing some diversion of water on the land to the north (there is no evidence that any damage was suffered in 1944) and not until 1946 that there was evidence of an overflow from the ditch onto the land to the north that caused plaintiff any damage. When the complaint was made in 1944 the entire ditch was reconstructed with a dragline. It is true plaintiff's grantor paid $75 to defendants' grantor to help pay for the cost of reconstruction but this appears to be no more than a voluntary contribution. It affirmatively appears from the record that there was no assumption of future maintenance expense. Actually it was not until 1946, until plaintiff's land was flooded and he was damaged, that he had any right to complain of the ditch. Certainly he had no right to complain as long as the ditch carried off the water without damage to him. The testimony with respect to plaintiff participating in repairing the ditch has to do with the repairs made in 1944 before and after the flooding nine-inch rain. At that time he was told by Brown, the then owner of the ten-acre tract, that the ditch was a mutual proposition and that plaintiff's landlord had paid half of the construction. The trial court specifically found there was no mutual agreement for maintenance and we agree with this finding. With plaintiff's crops in danger if the ditch overflowed, it is understandable that he would assist in repairing the ditch but such acts are insufficient upon which to ground an estoppel by acquiescence.

III. The seventh paragraph of the court's finding held:

"This drainage system or ditch through acquiescence having become the natural watercourse across the defendants' land they are not required to do more than refrain from the doing

of some act or permitting the unlawful obstruction thereof. No satisfactory showing has been made that the defendants have committed any such acts. The defendants would not be required to remove the silt from this ditch that washes down from other lands for the express benefit of the plaintiff."

This finding cannot be sustained. It is true that an artificial watercourse can become a natural watercourse when, for the prescriptive period, it serves in lieu of the natural channel, Nixon v. Welch, 238 Iowa 34, 24 N. W. 2d 476, 169 A. L. R. 1141, but it only becomes such as to the parties through whose lands it runs. It cannot be argued that a landowner exercising the right to direct surface water on his own premises without burdening his neighbors, gains a prescriptive right as against his neighbors, so that what is once a diversion ditch on his own premises becomes, after ten years, a natural watercourse, about which the neighbors cannot complain when the diversion ditch begins to cause them damage. In Falcon v. Boyer, 157 Iowa 745, 750, 142 N. W. 427, 429, we stated:

"A watercourse is defined as a natural stream of water usually flowing in a definite channel, having a bed and sides, or banks, and discharging itself into some other stream or body of water. It is not necessary that its origin be exclusively the work of nature. It may be aided by the hand of man; but if thereafter it becomes a living flowing stream of water, with all the essential elements of a watercourse, and has remained in such condition for the prescriptive period, then, as to parties through whose lands it runs, and as to their rights, it becomes a watercourse, and their right to divert it or control it, to the prejudice of riparian owners, becomes fixed and settled."

Clearly, as to the plaintiff in this case, the ditch was not a natural watercourse. It was an artificial diversion ditch, located entirely on defendants' land, and, though it was there for nearly twice the prescriptive period, the defendants cannot assert it became a natural watercourse, excusing them from full maintenance duties and rendering them immune from damages caused by their failure to maintain.

There is not any testimony that this diversion ditch is of any benefit to plaintiff's land. The evidence is clear that if the ditch were not there the water coming through the culvert would go somewhat in the direction the culvert points, probably not in any well-defined channel but at least it would go south and west over the ten-acre tract. It is our conclusion that plaintiff was not estopped from claiming injunctive relief when his land was flooded and damaged by the diversion ditch in 1946 and that the injunctive relief prayed for in his petition should have been granted.

IV. There was no mutual duty to keep this diversion ditch in repair. The burden of maintaining it so that it would not cast the water that came through the culvert upon plaintiff's land was on the defendants. This was defendants' ditch. The general rule, as stated in 67 C. J., Waters, section 342, is that "an owner has the duty of preventing his ditch from becoming filled up or obstructed where such circumstance will result in setting the water upon the lands of adjoining owners * * *."

In Miller v. Perkins, 204 Iowa 782, 785, 216 N. W. 27, 28, it was held that Perkins' land being the servient estate was burdened with water from the Miller land but "that, after the water left the Miller land * * * it was no concern of Miller's how this water was taken care of by the Perkins land, so long as its treatment and handling did not interfere with the Miller land. In other words, the owner of the Perkins land had a right to change the course of this water, after it left the Miller land, and carry it east along the railroad right of way in any manner he saw fit; but in doing this, he was bound to see that his handling of the water was not to the injury of Miller. *This, of course, carries with it the idea that it was the duty of the owner of the Perkins land to at all times keep this artificial ditch constructed by him open and free from obstructions, so long as he chose to handle this water in this way * * *.*" (Italics supplied.)

This duty to keep such a ditch cleared out was also recognized in Mickelwait v. Wright, 194 Iowa 1265, 1268, 191 N. W. 291, 293, where it was stated:

"It will be presumed that, if the ditch has a tendency

to fill up, the appellant will cause the same to be cleaned out and restored to its former condition, rather than to permit the water in the ditch to overflow upon the adjacent lands and do damage to appellee."

■ V. Plaintiff's claim for damages rests upon his testimony that his land was in oats and it would normally have yielded an average of 50 bushels per acre or 2,825 bushels, but only 1,582 bushels were actually harvested. Based upon a price of 71 to 74 cents a bushel he claimed damages in the sum of $882.53, less $18.64 the customary hauling charge, or $863.89. But it appears from his testimony that the real damage did not consist of injury to the oats caused by the water. He testified that the oats were ripe and ready for harvest at least two weeks before the combines entered the field and that the reason the oats were not combined sooner was because the field was so wet they could not get into the field sooner. While it is not very clear in the evidence, it seems the plaintiff's road into the field is at a point just north of the culvert off of the public road and thence along the fence line just north of the culvert. There is other testimony about an opening into plaintiff's field somewhere to the north of the road last mentioned and evidence that the field was entered with a baler and tractor over a cornfield shortly before the oats were ripe. The defendants' testimony was that the delay in combining the oats was caused by plaintiff's inability to hire a combine when the oats were ripe, and the man who worked for plaintiff when the oats were combined, hauling the loads to the bins, testified the oats he hauled in from the combine filled one bin which he estimated would hold 2,000 bushels and five or six hundred bushels more were put in a second bin.

Plaintiff presents a short argument in support of his claim for damages. As in so many cases of this nature the accent in the evidence in the trial below and in the brief filed in this court is on the claim for injunctive relief. Defendants' testimony that the oats from this field filled a two-thousand-bushel bin and five or six hundred bushels over, went unchallenged in the sense that plaintiff testifying in rebuttal did not touch upon this testimony of his own employee. A reading of all the

evidence with respect to damages indicates the plaintiff did suffer some damages, and for that reason we think he should have the injunctive relief prayed for, but the stress was not on the amount of damages and we feel the record unsatisfactory and insufficient upon which to base an assessment of damages in this case.

For the reasons stated the judgment of the trial court for the defendant on the question of damages is affirmed, and the judgment denying the injunction is reversed and the cause is remanded for a decree in harmony with this opinion.—Affirmed in part; reversed in part.

OLIVER, BLISS, HALE, MANTZ, SMITH, and HAYS, JJ., concur.