Oscar Bellville and Fern Bellville, plaintiffs-appellants, v. Virgil Porter, defendant, Iowa State Highway Commission, intervenor-appellee, Mary Louise Schwertley et al., individual intervenors-appellees.

No. 51315.

(Reported in 130 N.W.2d 426)

1120

September 22, 1964.

Prichard & Prichard, of Onawa, and Wm. F. Welch, of Logan, for plaintiffs-appellants.

Evan Hultman, Attorney General, James E. Thomson, of Ames, and Michael Murray, of Logan, for intervenor-appellee Iowa State Highway Commission.

Fred E. Egan and Kenneth C. Acrea, both of Missouri Valley, for intervenors-appellees.

THORNTON, J.—This is a watercourse case. Two are involved, one a ditch, well-established and recognized by all parties, known as the Bellville (plaintiffs') Ditch, the other a slough, through which plaintiffs contend overflow water from the Bellville Ditch flows north and west through the Porter forty.

Plaintiffs started this action to compel defendant Porter to remove a dike across the slough. During the pendency of the action plaintiffs purchased Porter's forty and removed the dike. In the meantime the Iowa State Highway Commission intervened asking injunctive relief, now only as against the plaintiffs, for interference with the flow of the Bellville Ditch. The individual intervenors ask plaintiffs be enjoined from cutting the dike on the Porter forty and casting water on them, and further the Bellville Ditch be established as a watercourse and for a determination of who shall repair and maintain it.

Plaintiffs ask both petitions of intervention be dismissed because the situation is properly one for the formation of a drainage district.

The trial court held plaintiffs had interfered with the Bellville Ditch and ordered them to clean it out and permanently maintain it to a depth of seven feet below low steel on the high-

way bridge. Further that said ditch should be constructed with the dikes on each side of equal height, that plaintiffs must not remove the dikes or cause the water to flow north onto intervenors' land, that the individual intervenors have a prescriptive right to the maintenance and cleanout of the artificial part of the Bellville Ditch and enjoined plaintiffs from interfering with such cleanouts and maintenance. From this plaintiffs appeal.

The land involved is Missouri River bottomland in Harrison County. The Bellville Ditch has its source in the hills east of U. S. Highway No. 75, a north-and-south highway. The ditch flows southwesterly from the hills to a 24-foot by 24-foot bridge on Highway 75 and then three fourths of a mile northwesterly, westerly and southwesterly to the Allen Creek Ditch. The bridge was built in 1926 when Highway 75 was paved. It is located about 200 feet south of the dividing line between section 11-79-44 on the north and section 14-79-44 on the south. The Porter forty, now owned by plaintiffs, is just west of the highway and is the southwest quarter of the southeast quarter of section 11-79-44. Plaintiffs' other land immediately involved is a forty, the northwest quarter of the northeast quarter of section 14-79-44, adjoining the Porter forty on the south, and an eighty, the north one half of the northwest quarter of section 14-79-44.

The Bellville Ditch is a natural watercourse east of the bridge and west of it to the southwest corner of the Porter forty. From there to Allen Creek Ditch it is an artificial ditch constructed by the Harrison-Pottawattamie Drainage District in 1951, though not part of the district. The Bellville Ditch from the bridge west flows northwesterly to just south of the south line of the Porter forty, and at about 350 feet west of the highway turns west to the southwest corner of that forty and its course west is along the section line between the land of some of the intervenors on the north and plaintiffs' eighty, the north one half of the northwest quarter of section 14, for a little more than three eighths of a mile, thence southwesterly across plaintiffs' and intervenor Athey's land to Allen Creek Ditch.

I. Turning to the highway commission's case the first question is, did plaintiffs interfere with and obstruct the natural flow of the water in Bellville Ditch to the damage of the com-

mission's right-of-way? Necessarily included is the extent of the interference, if any, and the amount of interference or obstruction from natural causes.

All parties concede the ditch is presently obstructed. The waterway under the bridge is filled up from its original depth of seven feet below low steel to two feet. The commission has cleaned out under the bridge on prior occasions and after the next good rain it fills up. The natural ditch on plaintiffs' land is filled to where the waterway between the dikes is now higher than the field level outside of the dikes, this condition exists in the artificial part of the ditch all the way to Allen Creek Ditch. Our question is, what caused the condition?

The commission in argument makes these statements:

"The problem * * * is caused by the failure and refusal of anybody to clean out or maintain any waterway between the dikes, particularly in the first quarter mile west from the bridge. * * * The Highway Commission has nobody to look to for restoration of this portion of the waterway except Bellvilles.

"This appellee will agree that there is no evidence that Bellvilles hauled in dirt for the purpose of filling up the waterway; we will agree that insofar as their operations consisted of excavating for a waterway, they did no damage to our dominant estate; but we very strenuously insist that their construction of banks or dikes alongside the ditch for the purpose of narrowing the waterway and preventing overflow from it, constituted 'interference' with the natural watercourse, so as to bring this case within the following rules of law and equity applied in numerous cases decided by this court, including Hunt v. Smith, supra."

We find from the evidence that prior to 1951 the natural ditch through Bellvilles' forty, next to the bridge, extended to the southwest corner of the Porter forty, the water flowed through the ditch to that point and then spread out over the land both north and south. In prior years there had been a settling basin about a quarter mile south of the present location of the artificial part of the ditch that ultimately drained into **Allen Creek Ditch.** There is evidence of cleanouts of the natural ditch for years prior to the construction of the artificial

ditch. In 1951 when the H & P Drainage District. constructed the artificial ditch it cleaned out the natural ditch to the bridge. By 1953 the ditch filled up, though requested to by some of the parties, the H & P Drainage District refused to clean the ditch. Mr. Smith, a drainage engineer for the H & P District in 1953, testified he made a report to the district in 1953. He reported the ditch was too small and wholly inadequate at the lower part; on the flat ground, down next to the Allen Creek Ditch. The east quarter mile was pretty good. The testimony of Mr. Athey tends to bear out this report that the ditch started to fill up from the lower end.

In 1954 plaintiffs cleaned the entire ditch, they put the dirt from the cleanout on the south side, their side of the ditch. In 1958 and again in 1961 plaintiffs made partial cleanouts of the ditch, the last was little. more than the removal of debris. Though plaintiff, Mr. Bellville, testified, "the dirt went as much one way as it did the other", we think the evidence shows the dike on the south of the ditch is from one to two feet higher than on the north. This is the most plaintiffs did to obstruct the flow of the water through the ditch.

Mr. Athey, one of the intervenors, speaks of the ditch filling up, he states "we should have maintained it or cleaned it out."

The evidence shows the watershed to the east of Highway 75 drained by the ditch is about 1000 acres. It is hilly and the runoff is rapid until the water hits the bottomland. The runoff from the bridge west is slow, the fall from the bridge to Allen Creek Ditch is about 18 feet. Mr. Virtue, a drainage engineer who had worked in Harrison County the last six years, testified he walked the entire length of the ditch to Allen Creek, "It is full of dirt and silt." He also testified, "When the water comes out of the hills into the Bellville Ditch and it is silted full the water takes the path of least resistance."

Mr. O'Connor, a special service engineer for the commission, testified:

"In my opinion we have two problems. One is to provide an outlet for the bridge which would require a ditch from the highway to an outlet at Allen Creek. We have the silting problem that will either require continued maintenance or an erosion

control structure upstream from the bridge on east to alleviate that silting problem. Neither one alone will solve the problem completely. Our outlet would be served with a ditch but it would require continual maintenance. In my opinion if there is an ample cleanout from the bridge west it will continue to silt until something is done to the east. The water comes down out of the hills at a higher velocity and any silt it is carrying is going to be deposited by the lower velocity of the waters reaching the low ground over the flats.

"Q. What would happen so far as the highway commission problem is concerned if all dikes were simply destroyed to the west? A. Our problem would be relieved until such time as all the land in this immediate vicinity west of the highway silted to the point where it was level with the highway.

"The Court: Just creating a large settling basin? A. Yes, sir; that would give us relief for a long time but eventually that is what would happen."

Mr. Thomas, county engineer for Harrison County, testified:

"I have had experience at other places in Harrison County with this same type of runoff and same type of ditch and when the water gets out on the bottomland it drops the silt and the ditch fills up."

We think the weight of the evidence sustains a finding the ditch filled up with dirt and silt from natural causes. All plaintiffs did to interfere with the natural flow of the stream was to raise the south bank or dike not more than two feet above the north bank. This action contributed very little if any to the problem of the highway commission.

The action here is not similar to that in Hunt v. Smith, 238 Iowa 543, 546, 28 N.W.2d 213, where the defendant built a dike across a slough. Nor in Bramley v. Jordan, 153 Iowa 295, 297, 133 N.W. 706, where the downstream-servient owner erected a dam across the old stream trying to force the water into an inadequate new ditch. There is a little similarity between the south dike in this case and the dike in Keck v. Venghause, 127 Iowa 529, 103 N.W. 773, 4 Ann. Cas. 716, that was erected to protect from the overflow. The claim there made by a downstream owner was that it cast more water onto his land. The

facts there did not substantiate such claim. The same is true here. It is not the south dike that slows the flow of water from under the bridge, but the natural dirt and silt filling up the stream. The water coming under the bridge is now forced to the north by the south dike, this bears on the case of the individual intervenors.

We think this case comes within the fact situation and rules of law announced in Nixon v. Welch, 238 Iowa 34, 40-44, 24 N.W.2d 476, 479-481, 169 A. L. R. 1141, 1145-1147. Plaintiffs are the owners of the servient estate. They could not block the watercourse nor cast it back on the commission's right-of-way by their action. The commission has an easement over plaintiffs' land for the purpose of repairing and maintaining the watercourse. If the commission was the only one benefited by such repair it would be called on to bear the entire cost. Here, however, that is not true. It is obvious from plaintiffs' raising the south dike that any overflow caused by the natural filling of the ditch will damage their land. They will receive a benefit from a proper cleanout of the ditch. Though the individual intervenors are not parties to the commission's case it is likewise obvious they will benefit. Their building of the north dike on their lands in 1961 is ample evidence of this. This is a case where costs of repair and maintenance should be apportioned not only between the commission and the plaintiffs but also intervenors not parties to this action.

In Nixon v. Welch, at page 44 of 238 Iowa, page 481 of 24 N.W.2d, page 1147 of 169 A. L. R., we said:

"We do not mean to imply that we would in an injunction action like this ever apportion costs in view of our statutes for the establishment of drainage districts and subdrainage districts where costs can be better apportioned."

In view of our statutes where costs of such projects can be better apportioned when it appears costs should be apportioned we decline relief so the parties may seek proper and more adequate relief.

II. In the case of the individual intervenors the first question is whether or not there is a natural watercourse for the overflow from the Bellville Ditch north and northwest across the

Porter forty that casts this overflow onto intervenors' land to the north and west.

Porter built a dike across the south end of his forty in 1961, this is a continuation of dikes farther west built by other intervenors. The evidence shows the borrow pit south of the dike filled up with water. After plaintiffs purchased the Porter forty they cut the dike and filled up the borrow pit.

The individual intervenors do not contend the overflow water from the ditch does not flow northwest and west through the cut in the Porter dike and onto the lands of the intervenor. At least six witnesses, some of them familiar with the land since 1913, testified that the overflow water followed that course. This is true both when the overflow is due to floodwater and when the Bellville Ditch is choked with silt as now. Some of the overflow would also go south except for the higher south dike built up by plaintiffs.

This slough to the northwest through the hole in the dike is a natural watercourse. See map on page 546 of 238 Iowa, page 214 of 28 N.W.2d, in Hunt v. Smith and discussion of a watercourse starting on page 556 of 238 Iowa, page 219 of 28 N.W.2d. In the discussion in the Hunt case this court quoted from a number of our earlier cases. We believe it is made clear there the line of flow of overflow water that habitually flows over a given course having reasonable limits as to width is a watercourse. Hunt v. Smith, supra, is authority Porter could have been enjoined from obstructing this watercourse, it follows plaintiffs were within their rights in cutting the dike. The intervenors could not on any theory called to our attention have gained a prescriptive right to this dike. First, it has not been there for the prescriptive period of 10 years, and, second, it was a diversionary action taken by Porter on his own land. Of course he may divert water on his own land as he wishes but in so doing he cannot cast the water back on higher ground. Logsdon v. Anderson, 239 Iowa 585, 30 N.W.2d 787.

The intervenors do have a prescriptive right to the Bellville Ditch, the first quarter mile has existed for more than 50 years and from there west to Allen Creek Ditch it has existed since 1951. But they do not have a prescriptive right to the

Porter ditch or borrow pit and Porter dike. See Logsdon v. Anderson, 239 Iowa 585, 593, 30 N.W.2d 787, 791, 792.

Intervenors cite Logsdon v. Anderson, supra, as supporting their claims that it is plaintiffs' duty to clean the Bellville Ditch and plaintiffs could not properly fill the Porter ditch and cut the Porter dike. It does not support either. In Logsdon the ditch was concededly a diversionary ditch and it is there pointed out when a landowner so undertakes he must handle the water so as not to injure an adjoining landowner or riparian owner. Where the ditch is a diversionary one built by the landowner he has the duty to keep the ditch in repair. But where it is a natural ditch or the ditch is one such as the artificial part of the Bellville Ditch the duty is mutual and falls on all riparian owners. See page 594 of 239 Iowa, page 792 of 30 N.W.2d. Here all plaintiffs have done is to raise the south dike of the Bellville Ditch. This they cannot do to the detriment of other riparian owners. Allely v. Fickel, 243 Iowa 105, 49 N.W.2d 544; Downey v. Phelps, 201 Iowa 826, 208 N.W. 499; and Keck v. Venghause, 127 Iowa 529, 103 N.W. 773, 4 Ann. Cas. 716. Plaintiffs should be ordered to lower the south dike to the same level as the north dike to Bellville Ditch. Here we have the question of the dikes or levees built by intervenors on the north side of the Bellville Ditch. From the southwest corner of the Porter forty west it is not necessary plaintiffs lower the south dike below the level of the dikes built by intervenors. From the southwest corner of the Porter forty east to the bridge plaintiffs should lower the south dike to the level of the north dike so no more water than the natural overflow to the north will flow through the cut in the Porter dike.

III. The individual intervenors have the right to clean out the Bellville Ditch as ordered by the trial court, without damage to others at their own expense if they so desire. Plaintiffs should be ordered to lower the south dike as above indicated. That part of the decree bearing on water flowing across the Porter forty onto the land of the intervenors is reversed.

On the petition of intervention of the Iowa State Highway

Commission the case is reversed·and remanded with directions to dismiss the petition.

The case of the other intervenors is reversed in part, affirmed in part, modified and remanded with directions to enter a decree in conformity herewith.

Costs are taxed one half to the Iowa State Highway Commission, three eighths to the individual intervenors, and one eighth to plaintiffs.—Reversed on the commission's case; affirmed in part, reversed in part, modified and remanded on the case of individual intervenors.

All JUSTICES concur except HAYS, J., not sitting.